Case 3:01-cv-00184-JBA  Document 105-2  Filed 02/20/2004  Page 1 of 15
Kaladish vs Unum Provident Corp., et al
2/20/2002                                                      Arthur L. Kaladish a/k/a Lawrence Kaladish

## Page 26

1  A   Are we finished with Exhibit 3?
2  BY MS. KEMP:
3  Q   No. I think you should keep it near you.
4  A   I'll keep it in a pile.
5  Q   The pile method is very good. Mr. Kaladish,
6      I'm going to show you a document dated
7      September 29th, 1989, and it's PLCAP00048, and
8      it purports to be from a George C. White to a
9      Jane Nobiletti, N-O-B-I-L-E-T-T-I, at Provident
10     Life & Casualty. Have you ever seen this
11     letter before today?
12 A   I don't believe so.
13 Q   All right. Mr. White states in this letter --
14     there's also written on this letter, "Send to
15     H.O. with ap, please." Do you see where that's
16     written on the top?
17 A   Yes.
18 Q   And it says, "Re Arthur L. Kaladish,
19     application No. 50755." And if you want, you
20     can refer back to the previous exhibit which is
21     Exhibit 3, and it depends on how well your
22     photocopy came out, but you will see a number
23     at the top of the page, and that number is
24     50755. If your copy did not come out clear --
25 A   No. It's not legible.

## Page 27

1  Q   But you see a number at the top of that page?
2  A   Yes, I do.
3  Q   In this letter, Mr. White states that he
4      enclosed a check from United Printing & Litho,
5      Incorporated, which was your employer and also
6      the payer of the premium. Do you see that
7      paragraph?
8  A   Correct.
9  Q   Now, is it true that United Printing & Litho
10     actually paid this amount towards your
11     premiums?
12 A   No.
13 Q   Then do you have any reason or belief why
14     Mr. White might include this in a letter?
15 A   Well, the -- from what I can remember -- and
16     it's going back a long ways -- Mr. White when
17     he took the application insisted on a check at
18     that time. He said he had to send in a check
19     for the application. Mr. White, as I said
20     earlier, was a little bit arrogant and very
21     insistent, and it was not uncommon for me to
22     borrow money from the company and repay it.
23 Q   So are you stating that the company did pay the
24     premium, but your testimony is that you repaid
25     them?

## Page 28

1  A   Yes.
2  Q   Where was United Printing & Litho located?
3  A   Bridgeport, Connecticut.
4  Q   And was it located at 1100 Boston Avenue in
5      Bridgeport?
6  A   Yes.
7  Q   And what -- and was your position the president
8      and CEO?
9  A   Yes.
10 Q   And did you have any ownership interest in the
11     company?
12 A   Yes.
13 Q   And did you have any partners or other
14     shareholders in this company?
15 A   Yes.
16 Q   And who were they?
17 A   Dexter Brooks.
18 Q   And what was Dexter Brooks' title or
19     association with the company?
20 A   Just an investor.
21 Q   And how many employees did you have in 1989?
22 A   I would have to guess in the neighborhood of
23     100.
24 Q   And what were your duties and/or
25     responsibilities as the president and CEO?

## Page 29

1  A   Managed the company in its entirety.
2  Q   At that time, did you personally do any service
3      work on any -- well, let me go back.
4          What type of service or product did
5      United Printing & Litho provide?
6  A   Commercial printing.
7  Q   And can you please tell me what you mean by
8      "commercial printing"?
9  A   Printed newspapers, circulars, catalogues,
10     directories, telephone books.
11 Q   At that point in time in 1989, were you,
12     meaning personally you, not your company --
13     were you involved in the repair and/or sale of
14     printing presses?
15 A   No.
16 Q   And did you pay back the -- the company back
17     for the premium?
18 A   I believe so.
19 Q   And how would you have paid them back, by
20     check?
21 A   Probably it was just withheld from the
22     paycheck.
23 Q   And did you have a comptroller at the time?
24 A   Yes.
25 Q   And what was his or her name?

Page 30

1  A   Madelyn Starkey.
2  Q   Starkey?
3  A   Correct.
4  Q   Can you spell the last name?
5  A   S-T-A-R-K-E-Y.
6  Q   And would she have had knowledge of whether the
7      payment amount was withdrawn from your check or
8      the repayment I should say?
9  A   I don't know.
10 Q   Would anyone who worked for United Printing &
11     Litho have knowledge of whether or not the
12     repayment was taken from your check?
13 A   I don't remember.
14 Q   Is there anyone who can -- to the best of your
15     knowledge and recollection who can attest that
16     this repayment was made?
17 A   I don't know.
18 Q   And how long did Madelyn Starkey work for
19     United Printing & Litho?
20 A   I believe seven years.
21 Q   And does she work for you in any capacity
22     today?
23 A   No.
24 Q   Is she a member of any board of directors that
25     you may be on?

Page 31

1  A   I don't believe so.
2  Q   Now, in this September 29th, 1989, letter,
3      Mr. White also states that the disparity in
4      income, i.e., the 51,000 to the 225,000, is
5      attributable to Mr. Kaladish's then impending
6      divorce so that on advice of counsel his fixed
7      income was maintained at a low level. Is that
8      correct?
9  A   I believe so.
10 Q   So the income that shows 51,000 -- let me
11     strike that.
12         You actually made more than 51,000,
13     but it was maintained a little bit differently
14     because you were in the process of divorcing
15     your wife?
16         MR. BONSANGUE: I object to the form.
17 BY MS. KEMP:
18 Q   Let me ask it a different way. Mr. White
19     states that on advice of counsel your fixed
20     income was maintained at a low level. Did you
21     actually make $51,000 in 1987 and '88 per year?
22 A   I don't remember.
23 Q   Did you -- in light of your impending divorce,
24     did you postpone any bonuses that you might
25     have been entitled to?

Page 32

1  A   I don't believe so.
2  Q   Mr. White in paragraph 3 says, "On the other
3      hand, the difference between 1989 and 1988
4      total compensation, i.e., salary plus bonus, is
5      primarily due to the fact that a portion of the
6      1988 bonus was reflective of results obtained
7      in prior years which, but for the impending
8      divorce, would have been payable earlier." Is
9      that correct?
10 A   I don't know. I don't remember.
11 Q   Do you remember keeping your fixed income
12     maintained at a lower level because of the
13     impending divorce?
14 A   I believe so.
15 Q   And what was the purpose of doing that?
16 A   Keeping the income at a lower level?
17 Q   Right.
18 A   My ex-wife tried to get as much alimony and
19     support as she could.
20 Q   And so you purposely kept your income low to
21     prevent her from obtaining more alimony?
22         MR. BONSANGUE: Objection to form.
23         You can answer.
24 BY MS. KEMP:
25 Q   Go ahead.

Page 33

1  A   I kept my income at a level that I could
2      survive on.
3  Q   And then after the divorce proceedings were
4      over, then your income resumed at a higher
5      level?
6  A   I believe so.
7  Q   Have you ever -- since this application, have
8      you -- I'll use the phrase in here. Have you
9      maintained your fixed income at a low level --
10     let me rephrase that.
11         How did you maintain your income at a
12     low level? How did you personally do it? What
13     was your salary?
14         MR. BONSANGUE: I just want to ask
15     when.
16         MS. KEMP: 1989, at the time of the
17     divorce in Mr. White's letter.
18 A   I don't understand the question.
19 BY MS. KEMP:
20 Q   All right. Well, you're the president and the
21     CEO of the company; is that correct?
22 A   Correct.
23 Q   And as such, you receive a certain salary; is
24     that correct?
25 A   Correct.

Page 50

1    think it's not the employment agreement?
2  A  No.
3  Q  Is there anything missing and/or omitted from
4     this document that you might have in your
5     employment agreement?
6  A  It appears to be in its entirety.
7  Q  Okay. Now, I'm going to refer you to the very
8     last page which is 000486, and I'm going to
9     refer you to some signatures. The first -- it
10    says, "L&L Graphic Contractors, Inc.," and it
11    says "By L. Kaladish." Do you see that?
12 A  Yes.
13 Q  Is that your signature?
14 A  Yes.
15 Q  And it also says, "Attest." And do you know
16    whose signature that is?
17 A  Yes.
18 Q  And whose signature is that?
19 A  My son-in-law.
20 Q  Okay. And is that Stephen J. Malione?
21 A  Malione.
22 Q  M-A-L-I-O-N-E?
23 A  Correct.
24 Q  And then underneath "L. Kaladish," there's
25    another signature that says, "A. Lawrence

Page 51

1     Kaladish."
2  A  Correct.
3  Q  And is that your signature also?
4  A  Yes.
5  Q  So you signed this agreement as both the
6     employee and the company; is that correct?
7  A  Correct.
8  Q  Now, I want to go over this employment
9     agreement. I want to start with term No. 3
10    which states, "Compensation," and it's on
11    page 000482. All right. Do you see that?
12 A  Yes.
13 Q  And it states that your annual base salary is a
14    minimum of $80,000 of this effective date. So
15    basically in '96, it was $80,000?
16 A  Yes.
17 Q  Now, I want to talk about this provision a
18    little bit more. It states in this paragraph
19    that you received an annual base salary. Did
20    you actually receive a weekly paycheck?
21 A  No.
22 Q  In fact, you did not receive any actual what we
23    would call W-2 wages from this agreement?
24 A  No.
25 Q  What was the purpose of this agreement?

Page 52

1  A  If it ever got to a point where I wanted to
2     sell the company, I would legally be able to
3     withdraw that money.
4  Q  Okay. And I've done some calculations, and I
5     see your attorney there is already getting
6     nervous, but you started at 80,000 per year,
7     and then you --
8        MR. BONSANGUE: I object to that.
9        MS. KEMP: Only because my numbers so
10    far -- I've transposed so many of them.
11 BY MS. KEMP:
12 Q  It started at 80,000 a year, and then you were
13    going to go up 10 percent per year, correct?
14 A  I believe so.
15 Q  So the second year, your salary would have been
16    88,000?
17 A  Or it could have been more. This says, "A
18    minimum of."
19 Q  No. I'm sorry. It states, "A minimum of" --
20    let's look at paragraph 3 because I might be
21    confused as well. It states, "A minimum of
22    80,000 as of the effective date" --
23 A  Correct.
24 Q  -- "and shall be increased annually at a rate
25    of 10 percent." So it doesn't say at a minimum

Page 53

1     of 10 percent.
2  A  No, but what it says is there would be a
3     minimum salary of 80,000. If I wanted to draw
4     90,000 or if I wanted to give myself 100,000 --
5  Q  -- you could do that?
6  A  -- I could do that. And then the following
7     year would be 10 percent of the preceding year.
8  Q  I understand. Thank you. Thank you. In
9     theory -- again, I'm not saying this happened,
10    but the second year, you could give yourself a
11    salary of 100,000, and then you would be
12    10 percent of that 100,000?
13 A  The way it was drawn up was I had a base salary
14    of $80,000. Now, if I wanted to pay myself
15    100,000 that year, the following year would be
16    a 10 percent increase of the 100,000.
17 Q  Right. So it would be 110,000?
18 A  Right, minimum, and then I could still increase
19    that if I wanted to.
20 Q  Okay. But, again, you did not receive a weekly
21    or biweekly paycheck?
22 A  No.
23 Q  Okay. And, again, you did not receive any
24    actual what I would call W-2 income or wage
25    income?

Page 54

1  A   No.
2  Q   And as a result of this employment agreement,
3      what did you receive in terms of a salary?
4  A   Promissory note.
5  Q   And we'll get to that in a second. Paragraph
6      3.2 -- paragraph 3.2 states for the benefit of
7      the company you accept and agree to include all
8      employment compensation due excluding interest
9      for a period commencing on the effective date
10     and continuing until the close of business on
11     the third anniversary of the effective date.
12     Do you see that provision?
13 A   Yes.
14 Q   Can you explain what that provision means or
15     that sentence means?
16 A   It means that I would not physically withdraw
17     the salary or wages from the company. I would
18     leave it there, and it would be accrued for a
19     minimum of three years.
20 Q   When you first began employment in 1996, did
21     you purchase any workers' compensation for
22     yourself?
23 A   No.
24 Q   Now, 3.3 states that the company hereby agrees
25     to pay you, Mr. Kaladish, the amount of

Page 55

1      8 percent interest on all accrued unemployment
2      compensation due, to be compounded annually.
3      Do you see that?
4  A   Yes.
5  Q   And that amount of 8 percent interest -- no.
6      Strike that.
7          It states further in the paragraph
8      that you may demand and the company agree to
9      pay all accrued interest. Do you see that, the
10     last sentence on 3.3?
11 A   Correct.
12 Q   Did you ever get paid any of the accrued
13     interest?
14 A   I don't believe so.
15 Q   Paragraph 5.2, which is located on 484, it
16     states that if you should be unable to perform
17     the services under this agreement to be
18     performed by him during the employment period
19     by reason of disability or if you should die
20     during such period your employment's going to
21     be terminated as of the date of the death or
22     disability. It then states, "In such event,
23     Kaladish shall be paid only the amount of
24     compensation which would be due him up to the
25     date of such termination." Do you see that?

Page 56

1  A   Yes.
2  Q   Okay. Can you explain what this provision
3      meant?
4  A   Well, the first part of it, I think, is
5      self-explanatory. If I became disabled or
6      died, then my employment would terminate. The
7      second part? I honestly don't know what it
8      means. I would assume it means I would just
9      get paid up to that point.
10 Q   So assume again -- this is an assumption.
11     Assume this started January 1st, and you were
12     disabled on December 31st. Does that provision
13     mean that you'd be paid compensation for that
14     year, up to that year?
15 A   I would assume so.
16 Q   Okay. Who wrote this agreement or who drafted
17     this agreement?
18 A   It was taken from a -- somebody else's
19     employment contract.
20 Q   Now, I also note throughout this agreement, for
21     example, in paragraph 2 and in paragraph, say,
22     6.1 there's mention of a board of directors.
23     At any time did L&L Graphic have a board of
24     directors?
25 A   No, I don't believe so.

Page 57

1  Q   Why then was the phrase "board of directors"
2      placed in this agreement?
3  A   Like I said, this contract was taken from
4      somebody else's -- this agreement was taken or
5      copied from somebody else's agreement.
6  Q   It also mentions in paragraph 7.2 -- it says if
7      you have any notice or communication to send it
8      to the attention of the president, and was that
9      you? Were you the president of the company?
10 A   Yes.
11
12         (Defendants' Exhibit No. 7,
13         Bates Nos. 000460-465, marked
14         for identification.)
15
16 BY MS. KEMP:
17 Q   Mr. Kaladish, I'm going to show you Exhibit 7,
18     and it's actually -- Exhibit 7 is actually
19     comprised of three documents, and all three
20     documents are promissory notes. One is dated
21     August 9th, 1997. One is dated August 4th,
22     1998, and one is dated June 9th, 1999. Your
23     attorney's office Bates stamped them from
24     "00046" to 000465. So it's 000460 to 000465.
25     With regard to all of these

Page 158

1  A  Yes. I have the leases.
2  Q  All right. Now, I notice -- let me say this.
3     Do you know what size -- how much square
4     footage L&L Graphics had?
5  A  That I don't remember.
6  Q  I believe in one of Mike Kunkin's reports, the
7     report we just marked as an exhibit, he stated
8     that it was 4,000 square feet.
9  A  I don't think they were ever that low. I think
10    that we utilized the office complex which is
11    30 -- I believe it's 3200 square feet, and then
12    there was one portion of the manufacturing area
13    which was 4,000 feet so maybe that's where he
14    gets the 4,000 feet from is the part outside in
15    the plant, out in the plant, which would put us
16    at 7200, but prior to Bridgeport Machines
17    taking additional footage, L&L used a much
18    larger part of the building.
19 Q  Now, I see on your Schedule E under your
20    supplemental income and loss that if you look
21    at your rental income or loss from real estate
22    rental you ended up losing 159,859 for 1998.
23 A  Where did you come up with --
24 Q  00670.
25 A  Um-hum.

Page 159

1  Q  The next page which is 000671 is the income or
2     loss from partnerships and S corporations, and
3     on this page is listed L&L Contractors. Now,
4     this page has your total income from L&L
5     Contractors as $2,875. Is that correct?
6  A  That's what it says there.
7  Q  But is that correct?
8  A  I don't know.
9  Q  Who would know?
10 A  The accountant.
11 Q  Now, you have a form 1040 Schedule E which is
12    on page 000672, and in it, you have some
13    additional rental and real estate. One is land
14    and farm in Holmes County, Mississippi. Is
15    that the catfish farm?
16 A  Yeah. How did you find out about that? Long
17    story.
18 Q  Actually, it's all in your tax returns,
19    Mr. Kaladish. Now, do you still own the
20    catfish farm?
21 A  No.
22 Q  You sold it in 2000, I think.
23 A  I believe so.
24 Q  Well, anyway in 1998, you owned a catfish farm,
25    and you received 35,000 in rents; is that

Page 160

1     correct?
2  A  I guess so. That's what it says.
3  Q  And then you also have a residence at
4     Three Waverly Terrace in Huntington,
5     Connecticut. Now, that's not your home, is it?
6  A  It was jointly owned between my father and
7     myself. My father passed away, and the house
8     was deeded over to me because the title was in
9     survivorship.
10 Q  And do you rent it out?
11 A  Sold it.
12 Q  And when did you sell it?
13 A  Possibly '99 or 2000. I'm not sure.
14 Q  I think it's '99. Okay. And who did you rent
15    it to?
16 A  I don't remember renting it to anyone.
17 Q  Well, you have rents received, $550.
18 A  I don't remember where that came from.
19 Q  Okay.
20       MR. BONSANGUE: Just a break.
21
22       (A short break was taken.)
23
24 BY MS. KEMP:
25 Q  On your 1998 income on page 000663, on line 22

Page 161

1     it has as your total income $198,286. Do you
2     see that?
3  A  Yes.
4  Q  And yet it looks like the majority of your
5     income came from your capital gain or loss on
6     your stocks as well as tax-exempt interest. Is
7     that an accurate assessment of your income, the
8     source of your income?
9  A  I don't know.
10 Q  Okay. Well, it says on income 8A, taxable
11    interest, 22,7. Then 9 is ordinary dividends
12    which is 83. I'm just rounding the numbers.
13    Capital gain or loss which is from your
14    Schedule D, it says 253,935, and that's the
15    capital gains and losses from the stocks.
16       If you look at the bottom of 000668,
17    you'll see the 252,036. So out of the 253,935,
18    it's 252,036, and the remaining thousand
19    dollars or so seem to have come from your real
20    estate rentals.
21       MR. BONSANGUE: I object to the form
22    of the question.
23 BY MS. KEMP:
24 Q  Let me ask you this, Mr. Kaladish: On your tax
25    return, where does the majority of your income

41 (Pages 158 to 161)

Page 162

1    for your 1998 total income come from?
2  A  Well, apparently it appears that as you so
3     stated it's coming from the capital gains on
4     the sale of the stock.
5  Q  And, in fact, your return only shows an
6     approximate -- I'll get the exact amount --
7     $2,000 income from L&L Contractors. Is that
8     correct?
9  A  That's what it shows.
10 Q  And then it says line 14, "Other gains or
11    losses," and you have 70,000, and for whatever
12    reason, I think that comes from improvements
13    you made on your Boston Avenue property. Do
14    you recall if you made improvements --
15 A  Improvements wouldn't show up as additional
16    gains.
17 Q  I'd have to go through it.
18 A  Here's 4797. That's page 000674.
19 Q  Well, the problem is there's part one, part
20    three, part 27. I'm exaggerating a little bit,
21    but there's a lot of parts to it. So it looked
22    like it might have been what they call a
23    Section 123 gain, but I'd have to go through
24    and determine that so I won't.
25       Now, I note on 664 under "Other

Page 163

1     taxes," No. 50, you did not put a
2     self-employment tax. Is that correct?
3  A  Correct.
4  Q  So let's go to 1999. Now, 1999, line 22 on
5     page 711, shows your total income for 1999 to
6     be $147,313. Is that correct?
7  A  Correct.
8  Q  Okay. And No. 13, which is your capital gain
9     or loss, again, it shows a gain of 193,000. Is
10    that correct?
11 A  Correct.
12 Q  And, again, it appears that the majority of
13    this capital gain or loss which is on
14    Schedule D at 718 appears to come from the
15    selling of various stocks. Is that correct?
16 A  Correct.
17 Q  Now, on line item 12 which is "Business income
18    or loss," that 25,000 represents a settlement
19    payment. Is that correct?
20 A  I don't know.
21 Q  If you look on 725 -- that's the
22    self-employment tax. Oh, I'm sorry. I'm
23    sorry. 717 part 5, other expenses, it says,
24    "Settlement payment, 25,000." Do you see that?
25 A  Yes, I see it.

Page 164

1  Q  What was that a settlement payment for?
2  A  I have no idea.
3  Q  Were you involved in any lawsuits or claims in
4     1999?
5  A  No.
6  Q  When you saw your tax return, did you ask your
7     accountant what it was or what it symbolized?
8  A  No. I do not know what he does. I don't know
9     how he does it, and I really don't question
10    him.
11 Q  Now, with regard to your real estate gains or
12    losses, in 1999 you had a total loss of 48,663,
13    and I'll go over -- I'll go over some of them.
14    Let me start with Schedule E, your supplemental
15    income and loss. On page 721, you still had
16    the land in Naugatuck; is that correct?
17 A  Um-hum.
18 Q  And it's still undeveloped, and you're still
19    basically paying taxes on it?
20 A  Correct.
21 Q  You've sold B which is your Moose Hill Road; is
22    that correct?
23 A  It appears that way, yes.
24 Q  And you still have C which is your Boston
25    Avenue?

Page 165

1  A  Correct.
2  Q  And can you tell me why the rents went from
3     257,131 to 209,086?
4  A  No.
5  Q  Do you recall if you reduced any of the
6     tenants' rents like Bridgeport Machine?
7  A  I have no idea. If Moose Hill Road -- if
8     Monroe is removed from here, that would
9     reduce -- that's supplementary.
10 Q  That's right. That's under B.
11 A  I don't know.
12 Q  Okay. Now, under L&L Graphics which is on --
13    it looks like it's on 722. Mine's cut off a
14    little bit. That one now shows a nonpassive
15    loss of $47,767. Do you see that?
16 A  Yes, I do.
17 Q  723 still shows that you have the land and farm
18    in Mississippi?
19 A  Correct.
20 Q  And at that time, the rents you have from that
21    is 55,000 which is 20,000 more than in 1998?
22 A  Correct.
23 Q  Do you recall raising those rents?
24 A  No.
25 Q  What documents or documentation does your

**Page 166**

1   accountant base these numbers on?
2   A   The information I give him.
3   Q   So in 1999, again it shows a total income of
4       $147,313, correct, which is on page 711?
5   A   Correct.
6   Q   And on page 712, they still have your
7       occupation down as manager; is that correct?
8   A   Correct.
9   Q   And did any discussion about this tax return
10      jog your memory as to what settlement payment
11      cost you 25,000?
12  A   No.
13  Q   And do you recall if that settlement payment
14      came out of income?
15  A   No. I do not recall.
16  Q   Did you sell the Waverly Terrace home in 1999?
17  A   Correct -- oh, I take that back. I don't know
18      when I sold it. I believe it was in '99.
19  Q   Well, if you look at your tax return, can you
20      tell from your tax return?
21  A   No. I really don't know how to read the tax
22      returns.
23  Q   Let's go over your 2000 tax return. Now,
24      again, as with your other returns, you have no
25      what I would call W-2 income, no wages or

**Page 167**

1   salaries?
2   A   Correct.
3   Q   You have a capital gain of $405,000?
4   A   Correct.
5   Q   All right. And the capital gain of 4 -- the
6       405,000, it seems like 403,000 did not come
7       from stock. Do you know what it came from?
8   A   I believe it came from the sale of the farm in
9       Mississippi.
10  Q   And how long had you owned the farm in
11      Mississippi?
12  A   Since '91.
13  Q   And was the purchase price of the farm 110,000?
14  A   No. I bought one piece of property for -- I
15      bought three different pieces of property to
16      make up the entire farm.
17  Q   And did you sell them all at the same time?
18  A   Correct.
19  Q   All right. You're right. The 403,000 came
20      from the catfish farm. Now, what you have is a
21      loss, and it's on line 17 which is "Rental real
22      estate, royalties, partnerships and
23      S corporation." Do you see that?
24  A   Um-hum.
25  Q   Well, the first thing that I did is I looked at

**Page 168**

1   page 753, and I noticed that your nonpassive
2   loss from L&L Graphics was only $819, and I
3   don't mean to be facetious, but the former year
4   was 47,000. So I know that big loss didn't
5   come from that particular category. Do you
6   know where the loss did come from?
7   A   It's on page 752.
8   Q   Okay. And it says on page 752, line 10,
9       "Expenses," you had legal and other
10      professional fees of $217,000?
11  A   Correct.
12  Q   And that seemed to comprise the majority of the
13      expenses?
14  A   Correct.
15  Q   And what type of fees did you purchase for
16      $217,000?
17  A   Very expensive.
18  Q   I can tell that. Were they legal fees?
19  A   Yes, they were.
20  Q   And did they -- did the fees relate at all to
21      L&L Graphics?
22  A   No.
23      MR. BONSANGUE: Let me ask you a
24      question a second.
25      THE DEPONENT: Okay.

**Page 169**

1       MS. KEMP: Sure.
2
3       (A short break was taken.)
4
5   BY MS. KEMP:
6   Q   So with regard to the expenses, since it's in
7       category C, do these legal and other
8       professional fees relate to the property at
9       1100 Boston Avenue?
10  A   Correct.
11  Q   And, therefore, as a result of these -- no.
12      Let me go further on. Seventeen, rental real
13      estate, royalties -- according to your tax
14      return on pages 752 and 753, the loss of
15      $337,000 -- 337,414 was due to -- I should say
16      $819 of that loss was due to L&L Graphics. Do
17      you see where I have that as I can explain it?
18  A   I see it. It's on 753.
19  Q   Right. If you add line 26 on 752 and then 31
20      on 753, that's where you come up with the loss
21      of 337,414.
22  A   Um-hum.
23  Q   Did the injury you received in 1999 have
24      anything to do, or have any effect on or cause
25      the Schedule E losses as shown on page 752?

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

LAWRENCE KALADISH a/k/a :
ARTHUR L. KALADISH, :
    Plaintiff :
  :
v. : No. 3:01CV184 (DJS)
  :
UNUMPROVIDENT CORPORATION :
AND PROVIDENT LIFE & CASUALTY :
INSURANCE COMPANY, :
    Defendants. :

## RULING AND ORDER

On September 18, 2001, a status conference was held in the chambers of the undersigned on the defendants' motion to compel discovery and for entry of protective order **[doc. # # 19-1, 19-2]**. During that conference, the undersigned issued the following orders:

1. The plaintiff shall provide the defendants with copies of his tax returns for the years 1998, 1999 and 2000. The plaintiff shall also provide W-2 forms and balance sheets used to prepare these returns.

2. The plaintiff shall provide the defendant with copies of L & L Graphic Contractors, Inc.'s tax returns for the years 1998, 1999 and 2000. Plaintiff shall also provide W-2 forms and balance sheets used to prepare these returns.

3. The plaintiff shall depose Michael Kunkin at the defendants' counsel's branch office in Stamford, Connecticut, on a mutually agreed upon date.

4. With regard to the plaintiff's document request #3, the defendant shall allow the plaintiff to examine the original copy of the defendants' claim file and all documents and file folders contained therein, regarding the plaintiff's Disability Claim.

5. With regard to the plaintiff's document request #4, the defendants shall provide to the plaintiff any of the defendants' policies and/or pay incentives for work performance.

6. With regard to the plaintiff's document request #11, the defendants shall provide to the plaintiff all photographs or video and tape recordings depicting the plaintiff.

7. With regard to the plaintiff's document request #12, the defendants shall provide to the plaintiff all audiotapes and transcripts thereof relating to the plaintiff and any documents related to the same.

8. With regard to plaintiff's document requests #16 and #17, the defendants shall attest via affidavit that the requested documents do not exist.

9. With respect to plaintiff's document request #18, the defendants need not provide the documents requested.

10. With respect to plaintiff's document request #19, the defendants shall only provide documents pertaining to lawsuits filed against the defendants during the years 1998, 1999 and 2000. The defendants need not provide any other documents requested in plaintiff's document request #19.

Further, the scheduling order currently in effect for this matter is hereby modified as follows:

1. Reports from plaintiff's experts will be due by **Friday, November 30, 2001.**

2. Depositions of the plaintiff's experts shall be completed by **Tuesday, January 15, 2002.**

2

3. Reports from Defendant's experts shall be completed by **Friday, February 15, 2002**.

4. Depositions of defendant's experts shall be completed by **Friday, March 15, 2002**.

5. Dispositive motions, if any, shall be filed by **Monday, April 15, 2002**.

6. A joint trial memorandum shall be filed by **Wednesday, May 15, 2002**.

7. This case shall be trial ready **June, 2002**.

### Conclusion

In light of the order herein, defendants' motion to compel discovery and for entry of protective order **[doc. # # 19-1, 19-2]** is hereby **DENIED AS MOOT**.

**IT IS SO ORDERED** at Hartford, Connecticut, this 20th day of September, 2001

_____
DOMINIC J. SQUATRITO
UNITED STATES DISTRICT JUDGE

3

Kaldish v. UnumProvident Corp., et al.
Privilege Log - February 17, 2004

Laptop Computer Search - CD5

| STARKEY File | | | |
|---|---|---|---|
| Sub-Folder | Produce | Privilege/Objection | Description |
| BAIP-4-21-03 | No | Beyond Scope/Personal | letter from Madelyn Starkey to the board members of Boston Avenue Industrial Park Association |
| Boston~1 | No | Beyond Scope/Personal | proposal for accounting services from Madelyn Starkey regarding Boston Avenue Industrial Park Association |
| Starkey1 | No | Beyond Scope/Personal | proposal for accounting services from Madelyn Starkey regarding Boston Avenue Industrial Park Association |
| Starkey10 | No | Beyond Scope/Personal | letter from Madelyn Starkey to the board members of Boston Avenue Industrial Park Association |
| Starkey12 | No | Beyond Scope/Personal | fragments of emails regarding snow removal and fencing for the Boston Avenue Industrial Park Association |
| Starkey13 | No | Beyond Scope/Personal | portion of emails regarding Boston Avenue Industrial Park Association regarding snow removal and fencing |
| Starkey14 | No | Beyond Scope/Personal | personal address information |
| Starkey2 | No | Beyond Scope/Personal | letter from Madelyn Starkey to the board members of Boston Avenue Industrial Park Association |

Kaldish v. UnumProvident Corp., et al.
Privilege Log - February 17, 2004

| | | | |
|---|---|---|---|
| Starkey3 | No | Beyond Scope/Personal | fragments of emails regarding snow removal and fencing for the Boston Avenue Industrial Park Association |
| Starkey4 | No - EXCEPT for references to "Pressimator" on page 4 (items 5, 6, 7, 8) | Beyond Scope/Personal | email from Madelyn Starkey to Lawrence Kaladish - redact items 1, 2, 3, 4, 9 regarding personal advice and reminder to Lawrence Kaladish on page 4. Pages 1, 2, 3 are blank, with an email address on top of each of those pages. Pages 6, 7, 8 contain random text. |
| Starkey5 | No | Beyond Scope/Personal | email from Madelyn Starkey to Lawrence Kaladish regarding inquiries related invoices, taxes, insurance for the period of March 1998 - June 1998 |
| Starkey6 | No | Beyond Scope/Personal | proposal for accounting services from Madelyn Starkey regarding Boston Avenue Industrial Park Association |
| Starkey7 | No | Beyond Scope/Personal | portion of an invoice from Boston Avenue Industrial Park Association |
| Starkey8 | No | Beyond Scope/Personal | portion of an email regarding common charges for Boston Avenue Industrial Park Association containing random text |
| Starkey9 | No | Beyond Scope/No Text | email from Mike Starkey to Lawrence Kaladish showing address and subject lines of the email, but with no text |

Kaladish v. UnumProvident Corp., et al.
Privilege Log - February 17, 2004

## Laptop Computer Search
### QuickBooks (CD5)

| QUICKBOOKS File | Sub-Folder | Produce | Privilege/Objection | Description |
|---|---|---|---|---|
| BAIP.QBW | | No | Beyond Scope/Personal | financial information regarding Boston Avenue Industrial Park Association |
| BAIP1.QBW | | No | Beyond Scope/Personal | vendor information regarding Boston Avenue Industrial Park Association |
| sample_product-based business.qbw | | No | Beyond Scope/Personal | QuickBooks program used for Boston Avenue Industrial Park Association |
| sample_service-based business.qbw | | No | Beyond Scope/Personal | QuickBooks program used for Boston Avenue Industrial Park Association |

# Detail

# Corporations of the Nation℠

**Order a Report based on this Detail** | **Previous Screen**

| CONNECTICUT SECRETARY OF STATE | | | |
|---|---|---|---|
| Name: | L & L GRAPHIC CONTRACTORS, INC. | | |
| Type: | CORPORATION | | |
| Status: | ACTIVE | | |
| Date Incorporated: | | State of Incorporation: | CONNECTI |
| Corporation Number: | 296206 | FEI Number: | |

| Corporation Officers: | | |
|---|---|---|
| A LAWRENCE KALADISH | REG AGENT | MONROE, CT 06468 |
| A. LAWRENCE KALADISH | PRESIDENT | HUNTINGSTON, CT 0648 |
| A. LAWRENCE KALADISH | CHAIRMAN | HUNTINGSTON, CT 0648 |
| MADELYN STARKEY | SECRETARY | HUNTINGSTON, CT 0648 |

| Corporation Addresses: | |
|---|---|
| Address Type: | BUSINESS ADDRESS |
| | 10 WINCHESTER DR<br>HUNTINGTON CT 06484 |
| Address Type: | MAILING ADDRESS |
| | 17 WAYNE ROAD<br>MONROE CT 06468 |
| Address Type: | REG. AGENT ADDRESS |
| | c/o A LAWRENCE KALADISH |
| | 17 WAYNE ROAD<br>MONROE CT 06468 |

PLCCL00271

| | Additional Corporation Information: |
|---|---|
| Date:<br>Type: | **ANNUAL REPORT**<br>**REPORT DUE DATE:3/1/1997** |
| Date:<br>Type: | **ANNUAL REPORT**<br>**REPORT DUE DATE:3/1/1998** |
| Date:<br>Type: | 03/17/1994<br>**FILING DATE** |
| Date:<br>Type: | 03/17/1994<br>**MISCELLANEOUS**<br>**CERTIFICATE OF AUTHORITY** |
| Date:<br>Type: | 12/31/1996<br>**MISCELLANEOUS**<br>**REPORT** |
| Date:<br>Type: | 04/22/1997<br>**MISCELLANEOUS**<br>**AMENDED CERTIFICATE OF AUTHORITY** |
| Date:<br>Type: | 04/15/1997<br>**MISCELLANEOUS**<br>**REPORT** |
| Date:<br>Type: | **OTHER NAMES**<br>**PRIOR NAME:DREAMS UNLIMITED, INC.** |
| Date:<br>Type: | **OTHER NAMES**<br>**HOMESTATE NAME:L & L GRAPHIC CONTRACTORS, INC.** |
| Date:<br>Type: | **STATE OF INCORPORATION**<br>**DELAWARE** |

PLCCL00272