## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| LAWRENCE KALADISH a/k/a ARTHUR L. KALADISH | : | CIVIL NO. 301CV184 (DJS) |
| | : | |
| Plaintiff, | : | |
| | : | |
| V. | : | |
| | : | |
| UNUMPROVIDENT CORPORATION AND PROVIDENT LIFE & CASUALTY INSURANCE COMPANY | : | |
| | : | |
| Defendants. | : | JULY 19, 2004 |

## REPLY MEMORANDUM IN SUPPORT OF
## DEFENDANTS' MOTION FOR PROTECTIVE ORDER

The defendants in the above captioned matter, UnumProvident Corporation and the Provident Life and Casualty Insurance Company (hereinafter and collectively as "defendants" or "Provident"), respond to plaintiff's Objection to their Motion for a Protective Order with respect to Notices of Deposition served by the plaintiff, Arthur L. Kaladish, on Barbara Carra, in house counsel for Provident, pursuant to Rule 30(b)(6), and Eric Oram, defendant's computer expert.

### A.    Plaintiff's Objection Does Not Address the Issue of the "Particularized Relevance" of Attorney Carra's Deposition.

Plaintiff's deposition notice of Attorney Carra is completely frivolous and obviously intended to harass and annoy the defendant and its employees.

Plaintiff, completely ignoring the fact that *Attorney* Carra is a full time counsel for the defendants, tells the court that her deposition "... is reasonably calculated to lead to admissible

evidence in that she appears to be a *representative* of the defendants who is *familiar* with the defendants' decision making process in this bad faith case."[1]

First, as "bad faith" did not occur in this case, there is no justification for plaintiff to take any Provident employee's deposition with regard to this issue. Utilizing plaintiff's thought process defendants should be able to depose Attorney Bonsangue (plaintiff's previous attorney) as plaintiff's representative who is familiar with plaintiff's decision making process as related to the misrepresentation of his benefit claims. Plaintiff's reasoning is so absurd it give foundation to defendants' assertion that the intent of the deposition is to harass the defendants and its employees.

As in house counsel, Attorney Carra managed all litigation aspects of the case, directed local counsel as to appropriate legal actions and provided legal advice and strategy with regard to the defense of the case. In short, the only way that Attorney Carra became "familiar" with the defendants' decision making process in this case is *solely* due to her work with, and communications between, Provident, its employees and outside counsel *after* the commencement of litigation. Thus, in addition to the attorney client privilege, Provident also asserts the work product privilege. See *Perlata v. Cendant Corp.*, 81 FEP 1328, 1331 (D.Conn. 1999) (holding that the work product privilege protects communications by counsel to the former employee regarding the counsel's conclusions, opinions, or legal theories).

In their Motion for a Protective Order, defendants assert that in the rare occasions that discovery with regard to settlement conferences have been attempted, courts have held that such

---

[1] Since Attorney Tracy Alan Saxe was not plaintiff's counsel at the time of the settlement conference and, even more importantly, has never met Attorney Carra, defendants wonder how Attorney Saxe can represent to the Court that Attorney Carra "appears" to be familiar with anything with regard to this case?

testimony or evidence requires a particularized showing of relevance before they may be discovered.

This heightened requirement is justified by policy concerns. See, e.g., *Bottaro v. Hatton Assocs.*, 96

F.R.D. 158, 160 (E.D.N.Y. 1982)("we think the better rule is to require some particularized showing

of a likelihood that admissible evidence will be generated"). Even after receiving defendants' brief,

plaintiff has not attempted to make a "particularized showing" why Attorney Carra's deposition on

this conversation is even required. Additionally, plaintiff has not cited to one case or ruling to

support his position.

Defendants however are most concerned about the circumstances under which Attorney

Carra became a target for plaintiff's discovery mania. Plaintiff met Attorney Carra due to her

attendance at a court ordered *settlement conference* held on June 18, 2002 in front of Magistrate

Thomas Smith. Pursuant to his practice, Judge Smith ordered that a representative of defendants

with settlement authority be physically present at the conference. In this order, Judge Smith cites to

the case of *Nick v. Morgan's Foods*, 99 F. Supp. 2d 1056, 1062-63 (E.D. Mo. 2003), a case which

explains that attendance by a corporate representative is important because:

> "Meaningful negotiations cannot occur if the only person with authority to
> actually change their mind and negotiate is not present. Availability by telephone
> is insufficient because the absent decision-maker does not have the full benefit of
> the ADR proceedings, the opposing party's arguments, and the neutral's input.
> The absent decision-maker needs to be present and hear first hand the good facts
> and the bad facts about their case."

In sum, there can be no dispute that presence of the corporate representative is the cornerstone of

good faith participation in the settlement process. Defendants participated in good faith by

producing Attorney Carra as the corporate representative. However, by noticing Attorney Carra's

deposition, plaintiff stomps upon the very idea of good faith participation and acts with the bad faith that he wrongly accuses defendants of engaging in throughout litigation. The plaintiff found someone, who in his opinion, was knowledgeable about some aspect of the case, and now wants to depose her. However, the only way he "found" this person was because of her attendance at a settlement conference ordered by the court. By noticing Attorney Carra's deposition, plaintiff callously misused and abused the Court's settlement process. By his attempted deposition of Attorney Carra, plaintiff has turned the settlement session into "a stealth discovery session", *id.* p. 1063, a practice that the court should not condone.

With his actions, plaintiff is telling defendants (and the court) that all corporate representatives who, in good faith, attend a settlement conference are now fair game for the plaintiff's bar. Instead of allowing corporate representatives to participate in the settlement process, should the court now cover the corporate representative with the equivalent of an Afghan *burka* and banish them to another floor? If so, then what is the difference between the banishment and participating by telephone?

Accordingly, the only conclusion that can be reached is that plaintiff is acting in bad faith and the deposition noticed solely to annoy, harass and otherwise burden the defendants. As such, the court should issue a protective order prohibiting the deposition.

### B.    Plaintiff's Objection Did Not Address Defendants' Concerns About His 30(b)(6) Deposition Notice.

Once again, defendants note that plaintiff, in his objection to defendants' motion, does not address the issues and concerns raised by defendants with regard to his 30(b)(6) notice. Once again,

plaintiff does not cite to any case or legal authority in support of his position, nor, does plaintiff even

remotely disagree with defendants' claim that his Rule 30(b)(6) deposition notice is simply an ill

disguised attempt to depose Lisa Bengyak and Steve Carlson one more time to avoid running afoul

of the seven-hour limit.

Additionally, plaintiff's objection does not address defendants' position that his Rule

30(b)(6) Notice identifies subjects of inquiry that are entirely outside the scope of permissible

discovery and which have already been ruled upon by the Court. Plaintiff's Rule 30(b)(6) Motion

which requests that Provident designates someone to testify with regard to:

> *Matters known or reasonably available to UNUM regarding the financial*
> *reports of including but not limited any/all 10K reports filed within the*
> *time frame of the denial of the disability claim which was dated August 8,*
> *2000.*

Provident objected to this designation because this thinly veiled discovery request is almost

identical to discovery requests previously filed by Attorney Bonsangue, objected to by

UnumProvident and sustained by the Court. This request (regarding the discovery of all 10k reports,

etc.) was discussed *at length* with both counsel and Judge Squatrito at a status conference held at

Chambers on September 18, 2001. Provident's objection to discovery on this issue was upheld by

Judge Squatrito at the conclusion of the status conference (see also Ruling and Order of the Court

(10/05/03)). Plaintiff does not address this issue or why he should be allowed a second bite at this

apple.

Plaintiff has provided no argument to defendants' position that under the authority of *State*

*Farm v. Campbell*, 123 S.Ct. 1513 (2003), as well as established principles of relevancy and the

scope of permissible discovery, the requested discovery was improper because it seeks information

regarding information and possibly conduct that bears no relation or nexus to the harm allegedly

suffered.  Accordingly, the notice of deposition should be quashed.

**C.**     **Plaintiff's Objection Does Not State Why the Deposition Notice for**
          **Eric Oram is Required When A Stipulation Has Been Agreed Upon.**

Plaintiff's attempt to depose Eric Oram, a Computer Forensic Analyst and Trainer with DIBS

USA, Inc., is also a "second byte at the Apple."

Plaintiff admits that the parties had agreed to present a Stipulation of Facts concerning

Oram's testimony (for trial purposes) *in lieu of* a deposition and trial testimony but now argues that a

deposition should be allowed as "[t]his stipulation has not been completed because of reasonable

disputes about the meaning and conclusions that should be drawn from Mr. Oram's work regarding

important issues."  Provident asserts that any "reasonable disputes" are solely  products of plaintiff's

wishful thinking.

Plaintiff does not identify or otherwise delineate what these "disputes" and "important

issues" are which necessitates the time, expense and effort of a trip out to Texas to depose Mr. Oram

– in complete contravention of a Stipulation whose purpose was to obviate the very need and

expense for such discovery.  Provident's position that plaintiff cannot identify these issues because

there are none.

Provident attached its proposed Stipulation (based upon Eric Oram's Affidavit) as **Exhibit A**.

Provident attaches Affidavit of Lawrence Kaladish, (May 20, 2003) as **Exhibit B** and invites the

court to compare the two.  The Stipulation notes (and names) the deletion of approximately 44 files

from Kaladish's computer hard drive. The files note the names of companies and businesses. Defendants note that because these files were deleted and/or removed from the hard drive, there are no documents to show what these files actually contained.

In his <u>Affidavit</u>, Kaladish does not dispute he had these files, did business with these companies or sold parts to these companies but rather argues he did so pursuant to an agreement he had with All Press Parts. <u>Affidavit of Kaladish</u>, ¶¶ 4-21. Thus, Kaladish's own Affidavit has him admitting that: (a) he had these files at one time and (2) sold equipment to these companies. Due to Kaladish's own Admissions, there is nothing "unreasonable" about the <u>Stipulation's</u> information with regard to these files.

The <u>Stipulation</u> further states that Oram believes "Wipe Info", a Norton Utilities program, was used to delete these files. In his <u>Affidavit</u> Kaladish admits to using Norton Utilities, every two to three weeks, (at the advice of "Dell Computer") to delete all internet cookies, all temporary internet files and any obsolete files. <u>Affidavit of Kaladish</u>, ¶¶ 27-30. Kaladish even admitted that he ran Norton's Wipe Info to "delete all free space". <u>Affidavit of Kaladish</u>, ¶¶ 29(6). Again, there is no apparent difference between the proposed <u>Stipulation</u> and Kaladish's <u>Affidavit</u>.

As the court can determine, the proposed <u>Stipulation</u> and the <u>Affidavit of Lawrence Kaladish</u> dovetails in all important aspects. Kaladish is not denying that these files existed, that he did business with these companies and used Wipe Info to delete files and "free space." With the above in mind, the defendants must ask the court once again, what are the "reasonable disputes" and "important issues" that require the contravention of the purpose for the Stipulation and the deposition of Eric Oram?

There is none of course. Provident notes that the parties had agreed to the stipulation so that the costs of a deposition could be avoided. The only "fact" that Kaladish could object to is that he accessed the Wipe Info program the day that the original search of the hard drive was to be undertaken. However, the best way to refute that finding is not by deposition of Oram but by purchasing a copy of the hard drive mirror image from Oram and hiring an expert to analyze its data.

Provident asserts that the plaintiff, apparently unhappy with the court's unfavorable ruling, is once again attempting to circumvent the enforcement of the stipulation by deposing Oram. The court should not countenance such behavior and should issue Provident the protective order.

**D.    Conclusion.**

WHEREFORE, the defendant respectfully requests that the Court enter a protective order regarding the plaintiff's Notices of Deposition

Respectfully Submitted,

DEFENDANTS
UNUMPROVIDENT CORPORATION AND
PROVIDENT LIFE & CASUALTY
INSURANCE COMPANY

By Helen M. Kemp
Helen M. Kemp (ct 14790)
Theodore J. Tucci (ct 05249)
Robinson & Cole LLP
280 Trumbull Street
Hartford, CT 06103-3597
Tel. No.: (860) 275-8200
Fax No.: (860) 275-8299
E-mail: hkemp@rc.com

## CERTIFICATION

This is to certify that a copy of the foregoing was sent via first class mail, postage prepaid, on

this 19th day of July, 2004, to

Tracy Alan Saxe, Esq.
Saxe, Doernberger & Vita, P.C.
1952 Whitney Avenue
Hamden, CT 06517

_Helen M. Kemp_

Helen M. Kemp

# Exhibit A

## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

LAWRENCE KALADISH a/k/a ARTHUR L.   :   CIVIL NO. 301CV184 (DJS)
KALADISH                             :
      Plaintiff,                     :
                                  :

v.                                 :
                                 :

UNUMPROVIDENT CORPORATION AND   :
PROVIDENT LIFE & CASUALTY        :
INSURANCE COMPANY              :
      Defendants.              :

### STIPULATION REGARDING DIBS USA COMPUTER SEARCH

**WHEREAS,** on or about October 10, 2002, defendant Provident Life and Casualty

Insurance Company (hereinafter "Provident") obtained an order (hereinafter the "order") from

this Court to engage an expert to search the computer(s) of the plaintiff, Lawrence Kaladish a/k/a

Arthur L. Kaladish; and

**WHEREAS,** the order allowed said expert to review and analyze the plaintiff's hard

drive for documentation from the years 1999-2002 indicating money received or business

conducted with regard to his occupation or profession or business activities. This information

included letters, sales documents, price quotes, proposals for work or price, receipts, purchase

orders, vouchers, accounts payable, shipping charges and/or receipts of same,

acknowledgement(s) or receipt or arrival and/or receipts, invoices, bills of sale, accounting

ledgers kept in the course of business, cancelled checks, and/or any information relating to L&L

Graphic Contractors, and/or the sale or repair of any printing press and/or liquidation of any asset; and

**WHEREAS** the order also directed that the expert would be provided a list of key words and phrases (e.g., L&L Graphics, etc.) to aid in his search but could, pursuant to <u>Triumph Capital</u>, also review documents and other information not susceptible to keyword searches; and

**WHEREAS** the order directed that the expert could look for evidence business was conducted from or with regard to the information contained on his website in the form of inquiries and responses; and

**WHEREAS** the order directed that the expert could look for evidence of intentional obliteration, change or removal of data; and

**WHEREAS,** in furtherance of this court order, Provident and its counsel, the law firm of Robinson & Cole LLP engaged DIBS USA to perform a forensic examination of computers belonging the plaintiff in the above captioned matter to determine if the plaintiff conducted business during 1999-2002, the time he claimed to be disabled from his occupation; and

**WHEREAS,** Eric Oram, a Computer Forensic Analyst and Trainer with DIBS USA, Inc. performed the actual search and/or forensic examination of computers belonging the plaintiff from on/about March 4, 2003 until April 30, 2003; and

**WHEREAS,** Oram completed his search and made specific findings with regard to the search and submitted an Affidavit to this court with regard to such findings; and

**WHEREAS,** on or about September 3, 2003, the Court ordered that the parties prepare, and plaintiff will enter, into a stipulation regarding the expert's "computer search" findings as shown in Paragraphs #7, 8, 9, 10 and 11 of his Affidavit;

**NOW THEREFORE**, pursuant to the order of this court, and for the purposes of this litigation and proceeding only, Defendants UnumProvident Corporation and the Provident Life and Casualty Insurance Company ("Provident"), and Plaintiff Lawrence Kaladish do hereby agree and stipulate as follows with regard to Oram's computer search findings:

1.    Oram's search produced evidence that files containing documents, invoices, quotes and other printing related terms existed at one time on the hard drive. A great number of these file names contain dates which fall between 1999-2002 indicating these files were created during this time frame.

2.    The following file names were found referenced in other files such as being saved to a folder titled L&L Customers, but were no longer present on the hard drive:

| Missing Document or File | Document where referenced |
|---|---|
| \presstimator\quote plus detail printout 4-12-1.doc | Windows\WIN386.swp |
| Albayrak quote 8-19-99.doc | HP Simple Trax\Log\I01041527.log |
| All Press – Invoices.xls | LHSP\Speech Center\LHSDRept.lhd |
| Classic web quote folder 5-18-0.doc | HP Simple Trax\Log\I01041527.log |
| Corona cover letter 1-25-00.doc | HP Simple Trax\Log\I01041527.log |
| Corona fax references 1-31-0.doc | HP Simple Trax\Log\I01041527.log |
| Corona fax sheet 12-12-00.doc | HP Simple Trax\Log\I01041527.log |
| Corona references 1-31-0.doc | HP Simple Trax\Log\I01041 527 log |
| Corona quote 13 unit 1-25-00.doc | HP Simple Trax\Log\I01041527.log |
| Corona quote 8 unit revised 12-12-00.doc | HP Simple Trax\Log\I01041527.log |
| Corona quote 8 unit 1-25-00.doc | HP Simple Trax\Log\I01041527.log |
| Customer quote #1 – 4-14-1.doc | Norton Clean Sweep\CSRVMAP.dat |
| Customer quote #2 – 4-14-1.doc | Norton Clean Sweep\CSRVMAP.dat |

| Missing Document or File | Document where referenced |
|---|---|
| Egypt COV freight 11-23-99.doc | HP Simple Trax\Log\I01041527.log |
| Egypt COV 1-5-99.doc | HP Simple Trax\Log\I01041527.log |
| Egypt – Emak 5-22-0.doc | HP Simple Trax\Log\I01041527.log |
| Egypt ship fax 12-26-9.doc | HP Simple Trax\Log\I01041527.log |
| Equipment sales contract Goss Co. 10-06-00.doc | HP Simple Trax\Log\I01041527.log |
| Harte Hanks invoice fax 1-28-0.doc | HP Simple Trax\Log\I01041527.log |
| Inda fax used equip 8-21-99.doc | HP Simple Trax\Log\I01041527.log |
| Inda fax used equip 10-15-99.doc | HP Simple Trax\Log\I01041527.log |
| L&L Contractors, Inc.qbw (quickbooks) | Intuit\Quickbooks\QBWin.log |
| Leaoney – leotech cov 8-25-99.doc | HP Simple Trax\Log\I01041527.log |
| LeoTech COV 105 sale 10-01-9.xls | Windows\User.nu6 |
| Litho type installation global parts 10-26-0.doc | HP Simple Trax\Log\I01041527.log |
| Litho-type installation 10-26-00.doc | HP Simple Trax\Log\I01041527.log |
| Mount Olive proposal fax 7-28-0.doc | HP Simple Trax\Log\I01041527.log |
| Mount Olive quote 7-26-0.doc | HP Simple Trax\Log\I01041527.log |
| Mullen Pub fax proposal Goss units 4-14-0.doc | HP Simple Trax\Log\I01041527.log |
| Mullen Pub proposal Goss units 4-14-0.doc | HP Simple Trax\Log\I01041527.log |
| Mullen unit proposal 2-10-0.doc | HP Simple Trax\Log\I01041527.log |
| News Gleaner fax unit proposal 4-19-0.doc | HP Simple Trax\Log\I01041527.log |
| News Gleaner install 4-19-00.xls | LHSP\Speech Center\LHSDRept.lhd |
| News Gleaner press unit proposal 4-19-0.doc | HP Simple Trax\Log\I01041527.log |
| Print C – Findland units 2-22-0.doc | HP Simple Trax\Log\I01041527.log |
| Quote Plus Detail Printout 4-12-1.doc | Norton Clean Sweep\CSRVMAP.dat |
| Quote Plus Detail Printout REVISED 4-12-1.doc | Norton Clean Sweep\CSRVMAP.dat |

| Missing Document or File | Document where referenced |
|---|---|
| Sales agreement L&L -- Dan 8-04-1.doc | Windows\WIN386.swp |
| Tach installation 5-24-0.doc | Windows\WIN386.swp |

3.    Many of the documents were found in a log file in the folder HP Simple

Trax\Log\. On the Hewlett Packard website, it explains that; "HP Simple Trax can automatically

backup and index your files to CD so you can find them fast--even if you cannot remember the

file name. HP Simple Trax will let you know which CD your file is on even if it is not in the

drive." See http://www.hp.com/cposupport/information_storage/support_doc1pg40201.html. This

suggests that the files mentioned in the log were backed up onto CD at one time.

4.    Pursuant to the order, Oram also looked for evidence of intentional obliteration,

change or removal of date. As background, file deletion in the Windows operating system does

not eliminate the file from the computer. The file is not visible to the user but still remains on

the hard disk until it is overwritten by a new file. This data remains in unallocated or free space.

If the file is later partially overwritten by a new file, remnants of the original file may remain in

slack space. Slack space" is the space on a hard disk between the end of a file and the end of the

cluster that the file occupies. For example, on a drive with a 16 kb cluster size, there will be 5 kb

of slack space at the end of an 11 kb file. This mechanism allows forensic investigators to

retrieve data thought to be deleted.

5.    There exists on the market numerous software programs aimed at "wiping" hard

disks of this leftover data. These programs work by writing characters over the deleted files to

permanently remove them. Thus a hard drive's unallocated space and slack space can be

"wiped" clean. "One of the first places checked for evidence of wiping was the slack space.

Slack space usually contains remnants of old files or data from temporary memory. Oram found that on the Kaladish hard drive, the slack space of all of the files sampled was filled with the hexadecimal value DE. This is consistent with the slack space having been wiped.

6.      The Kaladish hard drive contained a software utility called WipeInfo. This utility is part of Norton Utilities and gives the user the ability to "wipe" data. The program can "wipe" files, folders, free space and slack space. On the Kaladish hard drive the date of last access of WipeInfo.exe was 2/12/2003. This is consistent with the program being executed on that date.

This Stipulation, consisting of six pages (6) pages, including all signatures, constitutes the understanding between the parties with respect to the DIBS USA computer search and examination addressed herein.

The parties represent that the signatories below are authorized to bind each of the parties hereto.

PLAINTIFF,                          DEFENDANTS,
LAWRENCE KALADISH                   UNUM PROVIDENT CORPORATION and
                                    PROVIDENT LIFE & CASUALTY
                                    INSURANCE COMPANY


By:_____         By:_____
                                        Helen M. Kemp (ct14790)
                                        Robinson & Cole LLP
                                        280 Trumbull Street
                                        Hartford, CT  06103-3597
                                        Tel:  (860) 275-8200
                                        Fax:  (860) 275-8299
                                        E-mail address: hkemp@rc.com

# Exhibit B

## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| LAWRENCE KALADISH a/k/a<br>ARTHUR L. KALADISH | : | CIVIL ACTION NO.<br>301 CV 184 (DJS) |
| | : | |
| Plaintiff | : | |
| | : | |
| VS. | : | |
| | : | |
| UNUMPROVIDENT CORPORATION | : | |
| PROVIDENT LIFE & CASUALTY | : | |
| INSURANCE COMPANY | : | MAY 20, 2003 |
| | : | |
| Defendants | : | |

### AFFIDAVIT OF LAWRENCE KALADISH

I, Lawrence Kaladish, hereby depose and say:

1.     I am over the age of eighteen (18) years and believe in the obligation of an oath.

2.     I am the Plaintiff in the above-entitled action and have personal knowledge of the litigation and/or allegations of same.

3.     In response to the affidavit of Eric Oram, I submit the following information regarding certain files/folders found by Mr. Oram during his search of my hard drive.

4.    Presstimator -  this has nothing to do with L&L, a friend was writing an estimating program for the printing industry and had asked for my opinion and recommendations.

5.    All Press invoices – this was invoices for the parts used in the rebuilding of the equipment that was sold. Can be verified through All Press Parts ("APP"), which we told them about in my deposition.

6.    Classic Web quote –This was a quote for APP for work that had to be done on part of the equipment that was sold. Equipment was sold by APP to Classic Web

7.    Corona – this was a quote and invoice for press work that Dan did in California. Can be confirmed by customer.

8.    Customer quote #1 -- part of the estimating program.

9.    Customer quote #2 -- part of the estimating program

10.    Egypt COV -- equipment sold to a company in Egypt, sale came through a company in USA.

11.    Equipment sales contract Goss Community (not Company) – I never sold anything to the Goss Company, this can be verified through Goss. I don't know who the sales contract was for, but it furthers my statement of equipment being sold.

12. Harte Hanks – This was an invoice to APP for work that had to be done on part of the equipment that was sold. Equipment was sold by APP to Harte Hanks

13. L&L Contractors, Inc. qbw (QuickBooks) – I attempted to use QuickBooks for the company financials but I did not have any luck with it.

14. Leaoney - Leoteck COV - Sale of equipment through APP.

15. Litho-Type – small service job Dan did in North Carolina. This job came from APP. Can be verified through customer.

16. Mount Olive – small service job Dan did in North Carolina. This job came from APP. This can be verified through the customer.

17. Mullen – small service job Dan did in Virginia. This job came from APP. This can be verified through the customer.

18. News Gleaner - service job Dan did in Virginia. This job came from APP. This can be verified through the customer.

19. Quote Plus Detail – estimating program.

20. Quote Plus Detail Revised – estimating program.

21. Sales agreement – probably a draft of the sales agreement for the sale of the company to Dan.

22.     Tack installation – this is an instruction sheet on how to install a tack generator onto a printing equipment.

23.     As you can see, most of these documents would support my claim that the increase in income resulted from a liquidation of assets. I would not have intentionally deleted these if I was trying to cover something up. They verified that I was liquidating all of the equipment that I had in the shop. All rebuilding or repair of the equipment was done by Dan and was coordinated between Dan and APP.

Any service work that was done was done by Dan and was either directly or indirectly done for APP. Again this was coordinated between Dan and APP.

24.     My agreement with APP was that we would buy the equipment, which Randy (who is a used equipment dealer) found in Holand, but did not have the money to pay for it so I had to put up most of the money, L&L would then store the equipment in Bridgeport and do any needed repairs and painting. Our agreement was that L&L had to purchase most if not all of the required parts directly from APP, with them making their normal markup. Once Randy (APP) found a buyer for the equipment we would deduct all expenses (cost to purchase the equipment, cost of parts, supplies and other materials, labor, freight and any other expenses) and if there was a profit, we would then share in it.

25.    What this arrangement was suppose to do was to generate work for L&L in the repair or rebuilding of the equipment and generate the sale of parts for APP for anything needed in the repair of the equipment. It probably would have work out alright except for the fact that I was unable to do the work, because of the accident, Dan was still somewhat inexperienced, Dan had to hire a helper and Dan made a lot of costly mistakes. When we factored in all the expenses we found that we could not sell the equipment for enough money to make a profit, at that point, we sold the equipment just to cover expenses and other than generating a small amount of revenue for labor, it was a losing proposition, especially for me because I had to tie up all of my money for the purchase of the equipment for well over a year. In fact, I still have a lot of equipment remaining in the shop that I have not been able to sell, mainly because I do not have the contacts and I am not a salesman.

Laptop Computer:

26.    My laptop computer was purchased in December 2002, almost one year after L&L was sold. I had to purchase it out of necessity due to my inability to climb the stairs in my home.  My original computer is located downstairs and is too large to put it upstairs.

New Hard Drive for Computer:

27.    Sometime in mid 2002, I had Dell Computer come to my house to address several problems I was encountering with my computer. The technician changed several parts, attempted to remove one of the operating boards, but the computer would not operate without it, and he made several changes to the operating system. He also had to order some additional parts and returned a week or two later.

28.    Because of all of the problems I was having and his inability to correct most of them, he was suppose to bring one of his hard drives to test the computer, but he did not bring one. On his second trip, he suggested replacing the hard drive.

29.    He made several recommendations in the proper maintenance of a computer, some of which I had already been doing and others were new to me. Using Norton's Utilities, I do the following on a regular basis, every two to three weeks:

1)    Delete all internet cookies

2)    Delete all temporary internet files

3)    Delete any obsolete files

4)    Run Norton's disk doctor

5)    Run Norton's disk defragment

6

6)    Run Norton's Wipe to delete all free space, this insures that any residual internet files are removed from the hard drive.

30.    Dell subcontracts a Connecticut firm to perform all of their service work in this area. I can contact the service company and ask them to furnish me with an affidavit as to the work that was performed and the regular periodical maintenance they suggested.


_____
Lawrence Kaladish


STATE OF CONNECTICUT )
                     )  ss: Milford
COUNTY OF NEW HAVEN )


Signed and subscribed to before me on this the 20th day of May, 2003.


_____
Louis J. Bonsangue
Commissioner of the Superior Court


F:\WPDOCS\JEANPUB\LOU\Kaladish Disability\Pleadings\affidavitkaladish52003.doc