## UNITED STATES DISTRICT COURT
### DISTRICT OF CONNECTICUT

LAWRENCE KALADISH a/k/a ARTHUR L.          :     CIVIL NO. 301CV184 (DJS)
KALADISH
                                           :
     Plaintiff,                        :

V.                                         :

UNUMPROVIDENT CORPORATION AND              :
PROVIDENT LIFE & CASUALTY
INSURANCE COMPANY                          :

     Defendants.                       :     SEPTEMBER 17, 2004


### DEFENDANTS' RULE 30 AND RULE 37
### MOTION FOR SANCTIONS AND MOTION FOR ORDER

The long awaited deposition of plaintiff's treating physician, Dr. Frank Scifo, was

scheduled to go forward on Saturday, September 11, 2004. Dr. Scifo arrived at the deposition

and was cooperative, pleasant to defendants' counsel and the court reporter, and anxious to

proceed with the deposition so he could enjoy the rest of the Saturday. Dr. Scifo had given up

attendance at a wedding so he could be deposed that day.

Upon his arrival, plaintiff's attorney, Tracy Alan Saxe insisted on speaking alone with

Dr. Scifo prior to the start of the deposition. As a result of this conversation, Dr. Scifo refused to

be deposed without his personal attorney present as he believed he would be placing himself in

some type of legal jeopardy if he answered questions without counsel. Accordingly, Dr. Scifo's

deposition was adjourned.

Intimidating one witness was apparently not enough for Saxe. During the second deposition scheduled for that day, a deposition of the plaintiff himself, Saxe continually demeaned defendants' counsel, Helen M. Kemp, made repeated objections, created arguments with her, made attacks on her ethics and generally exhibited the type of misbehavior that should not be tolerated in any court proceedings. Due to Saxe's egregious conduct, intended to slow access to information and humiliate opposing counsel, Kemp had to suspend the deposition pending court intervention.

The depositions scheduled by Kemp for September 11, 2004 were marred by Saxe's Rambo-like conduct including bullying, intimidation, coaching the witness through "speaking" objections, repeated attempts to delay and obstruct the deposition through unfounded objections and general disregard for the rules of evidence and ethics. The transcripts of the two proceedings as well as an affidavit in support of this motion are attached hereto.

## I.    APPLICABLE FEDERAL RULES AND STATUTES

### A.    Fed. R. Civ. P. 30—Deposition upon Oral Examination

Defendants assert that the conduct of plaintiff's attorney at the deposition was improper under Fed. R. Civ. P. 30. Fed. R. Civ. P. 30(d)(1) which provides that any objection during a deposition must be "stated concisely and in a non-argumentative and non-suggestive manner." Further, a witness may be instructed not to answer "only when necessary to preserve a privilege, to enforce a limitation directed by the court or to present a motion under Rule 30(d)(4)." Id.

Federal Rule 30 regarding depositions includes certain protections for deponents from the unprofessional behavior of deposing attorneys. If a deposing attorney conducts a deposition "in bad faith or in such manner as unreasonably to annoy, embarrass, or oppress the deponent or

party," the defending attorney may seek a court order to stop the deposition or to limit the scope

and manner of the deposition. See Fed. R. Civ. P. 30(d)(4). If the court grants relief as requested,

the deponent or party may also seek an award of expenses incurred in relation to the motion. See

*id.* Relief provided by Rule 30 also includes the right of the court to limit objections in

depositions as well as off-the record coaching and instructions not to answer.

B.    Fed. R. Civ. P. 37—Sanctions

Rule 37 addresses a variety of discovery failures that are without justification and not

harmless, including failure to obey a discovery order and failure to comply with Rule 26(e)

obligations Rule 37 is intended to encourage and enforce strict adherence to the "responsibilities

counsel owe to the Court and to their opponents," *National Hockey League v. Metro. Hockey*

*Club, Inc.*, 427 U.S. 639, 640, 49 L. Ed. 2d 747, 96 S. Ct. 2778 (1976); see also *Penthouse Int'l,*

*Ltd. v. Playboy Enters.*, 663 F.2d 371, 387 (2d Cir. 1981), and authorizes a court to impose a

variety of sanctions, including default judgment, see Fed. R. Civ. P. 37(c)(1) (incorporating Rule

37(b)(2)(C) which authorizes default judgment); *Communispond, Inc. v. Kelley*, 1998 U.S. Dist.

LEXIS 12336, No. 96 Civ. 1487, 1998 WL 473951, at *5 (S.D.N.Y. Aug. 11, 1998) (entering

default judgment under both Rule 37(b)(2) and 37(c)).

Rule 37 also authorizes imposition of sanctions for negligence or tactical intransigence as

well as willful or intentional wrongs. See *Penthouse*, 663 F.2d at 387; *Beers v. GMC*, 1999 U.S.

Dist. LEXIS 12285, No. 97- CV-482, 1999 WL 325378, at *4 (N.D.N.Y. May 17, 1999);

*Altschuler v. Samsonite Corp.*, 109 F.R.D. 353, 356 (E.D.N.Y. 1986).

In *Residential Funding Corporation v. DeGeorge Financial Corporation*, 306 F.3d 99

(2d Cir. 2002), the Court of Appeals recently reviewed some of the procedures set forth in Rule

37 for sanctioning discovery misconduct and emphasized that a court has "broad discretion in fashioning an appropriate sanction." Id. at 107. Courts have also noted Rule 37 sanctions may be applied both to penalize conduct that warrants sanctions and "to deter those who might be tempted to such conduct in the absence of such a deterrent." *National Hockey League*, 427 U.S. at 643; see also Penthouse, 663 F.2d at 386. In Rule 37 cases, intentional behavior, actions taken in bad faith, or grossly negligent behavior justify severe disciplinary measures. See *Penthouse*, 663 F.2d at 387; Altschuler, 109 F.R.D. at 356.

    C.    28 U.S.C. §1927—Counsel's Liability for Excessive Costs

In addition to the remedies provided by the Federal Rules of Civil Procedure, federal statutes also provide relief against attorneys who abuse the deposition process.

28 U.S.C. §1927 provides:

> Any attorney or other person admitted to conduct cases in any court of the
> United States or any Territory thereof who so multiplies the proceedings
> in any case unreasonably and vexatiously may be required by the court to
> satisfy personally the excess costs, expenses, and attorneys' fees
> reasonably incurred because of such conduct.

28 U.S.C. §1927 (1994).

## II.    FACTUAL INFORMATION

After months of waiting, on August 12, 2004, defendants contacted Saxe's office about rescheduling the depositions of Ferraria, Girasole, Kaladish and Scifo. Dr. Scifo was, and is, plaintiff's treating physician; Dr. Girasole is plaintiff's expert; and Daniel Ferreira was a former employee of plaintiff's and an important fact witness in this case.

Saxe's office was informed that Kemp wanted to take Dr. Girasole's deposition sometime during the week of September 27, was unavailable for any deposition during the week of

September 20 (as she was on vacation) but was generally available between August 23 through September 17. Kemp's office later informed Saxe's office that Dr. Scifo wished to be deposed on a Saturday to avoid office and patient disruption.

On August 23, 2004, Saxe's office responded by giving defendants' the dates of September 8, 2004, September 9, 2004, September 14, 2004 and September 15, 2004. Kaladish's deposition was subsequently scheduled for September 9 at 2:00 p.m. and Dr. Scifo was scheduled for September 11, 2004 at 10:00 a.m.

On September 7, 2004, Saxe's office called wanting to change the date and time of Kaladish's deposition. Unfortunately, due to Kemp's schedule, there were no alternate dates available. Kemp suggested that Kaladish's deposition be held after Dr. Scifo's deposition on September 11, 2004. After much discussion, Saxe's office agreed to the date, time and location and Kemp renoticed the deposition.

## III.    THE SCIFO DEPOSITION

Dr. Scifo arrived for his deposition on September 11, 2004. Plaintiff and his counsel had not yet arrived and Kemp showed Scifo to the conference room where the deposition was to be held. Affidavit of Helen Kemp, attached hereto as Exhibit A, ¶¶ 5, 7. A minute or so later, the court reporter arrived, and Kemp brought her to the same conference room as Scifo where she set up her equipment. Id., ¶ 8.

Upon arrival, Scifo was polite, courteous and cooperative. While waiting for the plaintiff to arrive, he informed both Kemp and the court reporter that he wanted to give his deposition and "be over with it." He noted that he had given up going to a wedding that day in order to be deposed. Id., ¶¶ 7-8

Plaintiff and Saxe arrived at approximately 10:15 a.m. Saxe wanted to speak with Scifo alone and asked him to leave the conference room so that they could speak in the hall. Kemp objected because it was already late and she wanted to get started. Id., ¶ 9. Saxe noted it was his right to speak to Scifo and took him into the hall. The plaintiff wanted to use the rest rooms and Kemp brought him to the men's room. Id., ¶ 10.

Upon her return to the conference room, she passed Scifo and Saxe still in the hall. Kemp noticed Saxe looking visibly upset and agitated. She told the parties that she wanted to get started when plaintiff returned from the men's room and started to go into the conference room. Id., ¶ 11. At that point Scifo came up to her and told her that he did not want to be deposed. Kemp asked Scifo what happed to change his mind. Id., ¶ 12.

Scifo informed Kemp that during the conversation with Saxe that Saxe had offered to be *his counsel* for the deposition and object for him on his behalf to inappropriate questions. Scifo refused this offer. Scifo told Kemp that after he refused Saxe's offer, Saxe told him that he may need an attorney because there may be patient-doctor privilege issues in the case and if he spoke at the deposition he could face potential legal issues under HIPAA. Scifo told Kemp that Saxe led him to believe that he could be placed in potential legal jeopardy if he testified without an attorney present. Id., ¶ 13.

Kemp asked Saxe what did he say to Scifo and Saxe refused to answer telling her if she wanted to know she could open the deposition and have Scifo testify on the record. Id., ¶ 14. Kemp did just that: she asked Scifo to sit down at the table to testify about the conversation with Saxe. Scifo sat down to be deposed and Saxe took the seat immediately adjacent to him. Id.,

¶ 15. Kemp had the reporter swear in the witness and asked him what transpired during the conversation with Saxe:

> Q   (by Attorney Kemp) Is it true that prior to this deposition Attorney Saxe asked to speak to you?
>
> A.   Yes.
>
> Q.   Is it true that you went into the hall to speak to him?
>
> A   Yes.
>
> Q.   What did you speak about?
>
> A.   Attorney Saxe offered to be my counsel during this deposition.
>
> Q.   And did Attorney Saxe give you a reason that you need counsel for this deposition?
>
> A.   In essence, I got the sense that he said that there may be questions  -- I expressed that I thought the intent of this was to review my notes and answer questions. He said, but maybe some of the questions maybe patient-doctor privilege. So, if they're[1] going to be paying close attention to that, I need to have my own legal counsel."

See Transcript of the Deposition of Frank Scifo, attached as Exhibit B, p. 4.

Defendants note that prior to the conversation with Saxe, Scifo was cooperative and ready to testify. However, after said conversation, he refused to testify because he now feared that he might be "potentially in legal trouble" -- a fear that only materialized after his conversation with Saxe. Id., ¶ 5.

Saxe then went on the record to "explain" his offer of legal representation and what it was really met to convey. However, Scifo responded to Saxe's "explanation" by turning to him and stating:

---

[1] By a slight  hand gesture, Scifo indicated by "they're", he meant Saxe and Kaladish.  Ex. A, ¶ 10.

> "My fear is that if I answer, I don't want to put myself into potential jeopardy and then have *you* come back and you should never have answered that question.

Exh. B, p. 9. (emphasis added). Defendants note that Scifo could only have gotten this fear from his conversation with Saxe. Scifo further explained:

> My understanding of this morning was that I was invited to give testimony on what's inside the chart and asked questions about what's inside the charts, a handwriting issue, whatever. Obviously, I'm under oath. Obviously, I have no vested interest as to who you work for or what happens with Mr. Kaladish's financial thing. I'm here as a physician to tell the truth, do whatever I have to do, and there's it. I thought that we will be able to work under those guidelines.

> I don't want to put myself in a position where Mr. Kaladish, who I have been treating for a number of years, comes back and says, or my attorney says, you shouldn't have said something and now we're suing you.

Exh. B, p. 12. In short, as a result of his conversation with Saxe, Scifo apparently believed that there was a possibility that Kaladish might sue him if he said things he should not say at the deposition.

Saxe's "on the record" claim that the privilege has been waived is disingenuous at best and misleading at worst. If the privilege was waived then why did Saxe bring it up to the doctor as an issue in the first place? Indeed, Saxe states on the record "if we object, and claim it is a privilege, that becomes an issue and you probably shouldn't answer it until a judge rules." (Ex. B, p. 10.) indicating that the privilege issue wasn't being waived.

After taking a break to allow Scifo to think about the situation and to contact counsel, Scifo went back on the record to state that he did not want to continue without his lawyer present. He explained, "I want legal counsel because of potential for violation of the "doctor-patient privilege," and I don't know what the new HIPA laws are. So, I have to find a HIPA

expert." Exh. B, p. 12. Due to Scifo's unwillingness to testify, the deposition was adjourned to give time for Scifo to consult with an attorney.

It is clear from the above events, not withstanding Saxe's self-serving comments on the record, that Saxe's initial conversation with Scifo in the hall interfered with Scifo's testimony. Defendants' assert that Saxe's conduct in speaking with Scifo violated numerous Rules of Professional Conduct as he for all intent and purposes solicited a nonparty witness in person by making misrepresentations about the need of representation and effectively intimidating the witness into not testifying at the deposition.

Rule 7.3 of the Rules of Professional Conduct states that "(a) A lawyer shall not initiate personal or live telephone contact…with a prospective client for the purposes of obtaining professional employment, except in the following circumstances: (1) If the prospective client is a close friend, relative, former client or one whom the lawyer reasonably believes to be a client…." The purpose of prohibiting such in-person solicitation is to prevent "substantial evils" such as "actual fraud, overreaching, deception, and misrepresentation." *Ohralik v. Ohio State Bar Assoc.*, 436 U.S. 447, 472-73 (1978).

In the case at hand, Saxe told Scifo that he needed an attorney because of possible potential problems with the patient-doctor privilege or HIPAA. This was a deliberate misrepresentation of the law in this area. Courts in this Circuit have routinely authorized defendants' access to medical records and information when the plaintiff, in initiating the action, has placed his or her physical or mental condition at issue. See *Home Ins. Co. v. Aetna Life & Cas. Co.*, 235 Conn. 185 (1995) citing and referring to *Goldenberg* v. *Wolfe*, 44 F.R.D. 33 (D. Conn. 1968), to support its claim. In *Goldenberg,* the plaintiff sued her attorney for legal

malpractice for his handling of a case in which the plaintiff's mental condition was an issue.  The

*Goldenberg* court held that:

> The material sought is not privileged. Conn. Gen. Stat. § 52-146a,
> defining privileged communications between psychiatrist and
> patient, provides that "there shall be no privilege for any relevant
> communications under this section: . . . (c) in a civil proceeding in
> which the patient introduces his mental condition as an element of
> his claim or defense, or, after the patient's death, when such
> condition is introduced by any party claiming or defending through
> or as a beneficiary of the patient, and the judge finds that it is more
> important to the interests of justice that the communication be
> disclosed than that the relationship between the patient and
> psychiatrist be protected."  Plaintiff has chosen to institute this
> action and cannot preclude defendant from preparing a proper
> defense. See *Awtry v. United States*, 27 F.R.D. 399
> (S.D.N.Y.1961).

*Id.*  The reasoning behind these holdings is simple.  When a plaintiff initiates an action and puts

her medical condition in issue, the harm to defendant in barring inquiry into these issues

*outweighs* the harm to plaintiff and/or his relationship with his medical providers.  See *Schramm*

*v. Stelly*, 2001 Conn. Super. LEXIS 1718, (Jud. Dist. of Litchfield)(2001); see also *Davis v. Ross*,

107 F.R.D. 326, 329 (S.D.N.Y. 1985)(applying New York law)("When the mental . . . condition

of the plaintiff is in issue, the physician-patient privilege is waived and cannot be invoked to

foreclose discovery of relevant evidence."); *People* v. *Wilkins*, 65 N.Y.2d 172, 480 N.E.2d 373,

375, 490 N.Y.S.2d 759 (N.Y. 1985)("It has . . . long been the rule that when a patient puts in

issue the condition for which he was examined by a physician he waives the privilege).

Additionally, disclosure of personal health information during the course of any judicial

or administrative proceeding to a party to the proceeding is permitted by HIPAA without the

written *authorization* of the individual. See  45 CFR § 164.512(e).  Kaladish placed his medical

condition at issue in this litigation.  Accordingly, he waived any patient-doctor privilege as well as any claims pursuant to HIPAA.

In short, there were no prohibitions or impediments under either HIPAA or the patient-doctor privilege to Scifo's testimony.  Saxe's deliberately misrepresented the state of the law to Scifo in order to coerce him into accepting Saxe as his counsel at the deposition.  Defendants assert that such misrepresentation, made for an improper purpose, is in violation of the rules of professional conduct and thus sanctionable by the court.

According to Rule 3.4(6) of the Rules of Professional Conduct, "[a] lawyer shall not: (6) request a person other than a client to refrain from voluntarily giving relevant information to another party unless: (A) The person is a relative or an employee or other agent of a client; and (B) The lawyer reasonably believes that the person's interests will not be adversely affected by refraining from giving such information."  Saxe's conversation with Scifo intended to thwart Scifo's testimony at deposition does not fall under any of these exceptions.

With regard to his misleading communication about the patient-doctor privilege, Rule 7.1 of the Rules of Professional Conduct states that "A lawyer shall not make a false or misleading communication about the lawyer or the lawyer's services.  A communication is false or misleading if it: (1) Contains a material misrepresentation of fact or law, or omits a fact necessary to make the statement considered as a whole not materially misleading...."  Saxe materially mislead Scifo by telling him he might need him (Saxe) to represent him at the deposition because of patient-doctor privilege issues. Finally, along similar lines, Rule 8.4(3) states that "[i]t is professional misconduct for a lawyer to...(3) [e]ngage in conduct involving dishonesty, fraud, deceit, or misrepresentation."  Defendants assert that Saxe engaged in

misrepresentation when he first approached Scifo and told him that because of patient-doctor privilege, he should have an attorney present at the deposition.

No matter what self serving comments Saxe may have stated on the record, the fact remains that after the initial conversation, Scifo remained convinced that he required legal counsel at the deposition in case he said something which would cause him to be sued by Kaladish. The court cannot countenanced such behavior and should grant defendants' motion for sanctions.

## IV.     The Kaladish Deposition

The Kaladish deposition began soon after the aborted attempt to depose Dr. Scifo. Not contact with intimidating Scifo to the extent he did not feel comfortable testifying, Saxe next attempted to intimidate Kemp by continually demeaning her, making repeated and "speaking" objections, attacking her ethics and professionalism and generally exhibiting the type of misbehavior that should not be tolerated in any court proceedings.

Saxe's conduct can be shown by the transcript itself. The body of the transcript for the Kaladish deposition was 80 pages long: 44% of the transcript is comprised of Saxe's speaking objections and personal attacks on Kemp. Saxe objects or speaks on 70 out of the 80 pages – no small feat when one realizes that Saxe did not cross examine plaintiff at the deposition. See Transcript of the Deposition of Arthur Kaladish, attached hereto as Exhibit C.

The deposition contains numerous improper speaking objections by Saxe. For example, on page 58 of the transcript, Saxe not only object to a question but explains his belief of what plaintiff is being asked to comment on and why he believes it is inappropriate. Ex. C, p. 58. In

addition to his constant speaking objections, Saxe made personal attacks on Kemp, her professionalism and her ethics.

Saxe inappropriately disparaged Kemp by informing her that she was "…making a mess of the record by not giving a proper question." Saxe later continued his abusive tirade against Kemp by telling his client "She gets confused. That's why she doesn't withdraw the question and poses another question." Ex. C, p. 41. At one point when Kemp told Saxe that his objection was noted, Saxe retorted:

> *By Saxe*: "Do I need your permission to have my objections noted all the time? I thought the court reporter takes it down whether you tell them to or not. I'm sorry. Do I need to set you straight on the rules? Do I need your permission to have my objections noted?
>
> *Kemp*: Attorney Saxe, what I think you might misunderstand about –
>
> *Saxe*: (interrupting Kemp): You don't need to understand what my objections are. I know that about the rules.

Ex. C, p. 36. When Kemp began to tell him that the federal rules anticipate some degree of common courtesy, Saxe retorted:

> Saxe: "I was in the magistrate's court-room and asked you for some common courtesy and you made it clear what the rules of the game were in this case. Live by them. It's too bad we had to decide to have a total lack of professional courtesy. You chose this route and you live with it.
>
> Kemp: Attorney Saxe, I think that was an inappropriate comment to make at a deposition on the record.
>
> Saxe: I think your comment that my comment is inappropriate is also inappropriate. What else would you like to say?

Ex. C, pp. 37-38.

Defendants believe that there is nothing left to say because Saxe made it very clear that his abusive and unprofessional behavior at the deposition was not done in some misguided attempt

to be a zealous advocate for his client but rather in *retaliation* for some previous perceived slight.

Saxe's personal attacks on Kemp continued as shown by the following exchange:

Kemp:    Attorney Saxe, I have been trying to be very patient

Saxe:    Thank you for that.

Kemp:    I don't need sarcasm. Unfortunately –

Saxe (interrupting Kemp): I thank you for being patient because in the past when I have
        dealt with you, you have been absolutely unbearable to deal with.

Exh. C, pp. 45-46. These untoward attacks on Kemp continued when Saxe ended yet another

tirade with the following comments:

Saxe:    We're here somehow because you managed somehow to get a stipulated order
        from prior counsel. I don't know how or why. But, here we are. Please ask your
        question. Let us go about our business to other cases and other matters and our
        private lives. You have a business being here. Don't give me speeches. Don't
        tell me things. Ask a question. If I don't like your question, I will object, and you
        can bring it to a judge."

Exh. C, pp. 46-47.

    When Kemp finally tells Saxe that she cannot continue the deposition if he keeps making

"inappropriate speeches and inappropriate comments" Saxe replies:

    The record reflects that you asked a question and I objected. Nobody made a
    speech except you. At the point where you made a speech, I instructed you to ask
    a question or we're going home. The point is that it is you who is not following
    the rules. I'm ready for you to ask a question, you won't hear anything from me
    except an objection as you heard throughout the day today. Please move on.

Exh. C, p. 50.

    The deposition transcript clearly shows that Kemp did not make such a speech. The

height of Saxe's abusive treatment toward Kemp occurred later in the deposition after a break

taken by the plaintiff. After the break, Kaladish came back with a cup of coffee. Exh. A, p. 23.

14

Kemp told the parties that she wanted to get started, she looked at Kaladish who was sipping and swallowing from a cup of coffee (Id.) and the following exchange ensued:

Q:      Are you ready Mr. Kaladish?

Saxe:   Excuse me, Are you talking to my client?

Kemp:   I asked him if he was ready and we could start.

Saxe:   From now on, let's be clear about what the rules are.  You ask me if we're ready.

Kemp:   Attorney Saxe –

Saxe:   (interrupting her) I don't need an argument.  Is there a question about that.  Do you have a problem talking to me instead of my client?  When you're on the record, you talk to him and them you ask him questions that are appropriate.  We don't have discussions.  You don't speak to my client without my permission.  Do you understand that?  That is part of the rules of evidence.  Do you have any problems with that? We're off the record.

Kemp:   No.  We are on the record.

Kemp then attempts to ask Kaladish a question:

Q:      Mr. Kaladish ---

Saxe    (interrupting Kemp): I'm sorry, we're not ready to go forward.  Any problem with that?

Kemp:   I have a problem with your entire commentary and your entire speech.

Saxe:   Are you going to continue to address my client off the record when I haven't given you permission? [2]  That's all I want to know because we will take it to grievance.  If you just say no, we'll move on.  If you don't intend to do that, just say I'm not going to do that.

Kemp:   I just asked him if he was ready.

---

[2] The absurdity of Saxe's comments are shown by the very fact that Kemp told him that they were on the record – therefore, she could not be speaking to his client "off" the record.  The fact that the conversation was taken by the court reporter indicates that Kemp did not speak to the plaintiff "off the record."

> Saxe:   Ask me. Is that clear? You don't talk to my client off the record. You talk to me.
> And tell Ms. Karan [Carra] the same thing.

Exh. C, p. 65-66. The comment concerning Barbara Carra, an in-house attorney for Unum

Provident, who attended a settlement conference held by Magistrate Judge Smith. Judge Smith

had ordered the parties to produce an individual with authority to settle the case. Ms. Carra was

the individual so produced. After Kaladish terminated the services of his former attorney, Saxe

attempted to depose Carra to find out what was said at the settlement conference. Saxe

continued this train of thought when during one off the record conversation.

One time when the parties were off the record, Saxe berated Kemp noting that if he had

to teach her a lesson [by grieving her] he would, as he had to show Barbara [Carra] a lesson.

Kemp believed the lesson reference to refer to Saxe's attempt to depose Barbara Carra. Ex. A,

¶ 24.

As Kemp noted at the deposition, a transcript does not indicate the tone of voice being

used or hand gestures. Saxe's tone of voice was abusive, argumentative and sarcastic. Ex. A,

¶26. Additionally, for at least two questions where Saxe did not have a ready objection, he

placed his hand before Kaladish, palm facing down about an inch or so above the table,

wordlessly mouth the question asked by Kemp, roll his eyes or make some other physical

manifestation of disparagement and then take his hand away indicating it was "safe" for plaintiff

to reply. Id. A review of the deposition transcript shows numerous examples of Saxe

improperly instructing his client not to answer the question, interrupting Kemp and through his

objections and "speeches", improperly coaching his client. A review of the record also shows

that plaintiff began to emulate Saxe in his responses even arguing with Kemp as to what her

questions were to him. (Exh. C, p. 52).

Defendants seek relief under Federal Rule 37 for Saxe's obstructionist discovery tactics. Rule 37 allows sanctions for both an attorney and his client who, as in this case, improperly instructs his client not to answer questions at a deposition, and the client follows the attorney's instructions to stonewall when asked proper questions. In addition to the numerated sanctions of the rule, a court may also order the retaking of a deposition. See *See* Fed. R. Civ. P. 37(a)–(b). Courts have even dismissed lawsuits against plaintiffs who have knowingly participated with their attorneys in substantial abuse despite court order to the contrary. See *Castillo v. St. Paul Fire & Marine Ins. Co.*, 938 F.2d 776 (7th Cir. 1991) (affirming award of $6,317.66 in sanctions against attorney and client working together to stonewall opposing counsel on proper deposition topics; also subsequently affirming dismissal with prejudice after client and attorney again stonewalled in rescheduled deposition after trial court approved questions and topics).

In the case of *Van Pilsum v. Iowa State Univ. of Science & Tech.*, 152 F.R.D. 179 (S.D. Iowa 1993), a case similar on the facts to this matter, the court imposed sanctions and granted a protective order against attorney after his "repeated objections and 'ad hominem attacks on [opposing attorney's] ethics, litigation experience, and honesty." In *Van Pilsum,* the court ordered costs of deposition against attorney and ordered that all future depositions be conducted in the presence of a discovery master.

Courts have also imposed sanctions against attorneys under 28 U.S.C. §1927 when the attorney's intentional actions during depositions, actions similar to Saxe's actions in the present case, have unnecessarily prolonged the discovery process. For example, in *American Directory Service Agency, Inc. v. Beam,* 131 F.R.D. 15 (D.D.C. 1990), the United States District Court for the District of Columbia imposed personal sanctions and deposition costs against an attorney

under 28 U.S.C. §1927 for conduct described as "nothing less than outrageous," when the attorney, as Saxe did in the present matter,  was found to have coached responses, improperly instructed his clients not to answer, made repeated objections, created arguments with opposing counsel and made numerous requests for clarification that "prevented the elicitation of any meaningful testimony." Id.

Other federal district courts have sanctioned similar "Saxe-type" deposition tactics. See *Brignoli v. Balch, Hardy & Scheinman, Inc.*, 126 F.R.D. 462, 466 (S.D.N.Y. 1989) (imposing sanctions against attorney for unreasonable and improper conduct during deposition); *Unique Concepts, Inc. v. Brown*, 115 F.R.D. 292, 293–94 (S.D.N.Y. 1987) (imposing sanctions and costs against plaintiff 's counsel for "abusive, disruptive, unreasonable, and dilatory behavior" during deposition constituting bad faith, where plaintiff 's counsel appeared on 132 of 147 pages in the record with statements other than an objection to the form of the question].

Defendants note that this court retain the inherent power to regulate conduct of all attorneys practicing before them. See Fed. R. Civ. P. 83(b); see also *In re Snyder*, 472 U.S. 634, 643 (1985). Federal Rule 83(b) acknowledges a judge's discretion to regulate practice "in any manner consistent with federal law, rules adopted under 28 U.S.C. §§2072 and 2075, and local rules of the district." See Fed. R. Civ. P. 83(b). United States District Court judges have exercised their inherent authority to sanction attorneys who frequently acted unprofessionally.

For example, in *Guerrero v. Board of Education*, 1994 U.S. Dist. LEXIS 9259 (N.D. Cal. July 5, 1994), rev'd on other grounds, 1995 U.S. Dist. LEXIS 34992 (9th Cir. Dec. 8, 1995), Judge Barbara Caulfield, citing cases from the Ohio and Colorado state courts, exercised the inherent authority recognized by Rule 83(b) to sanction an attorney who had committed eight

instances of blatant unprofessional conduct in depositions. See id. at *33. Judge Caulfield also

suspended the attorney from practicing law before the Northern District of California for certain

types of cases. See *id.* at *44.

The case of *Carroll v. The Jaques Admiralty Law Firm,* 926 F. Supp. 1282 (E.D. Tex.

1996), aff 'd, 110 F.3d 290 (5th Cir. 1997), involved an egregious example of conduct by an

attorney-defendant who verbally abused another party in a videotaped deposition. The trial court,

relying on its inherent power under Rule 83(b), awarded $7,000.00 in sanctions against the

attorney. See *id.* at 1293. On appeal, the award was affirmed by the fifth circuit, which made

strong observations about an attorney's role as officer of the court and duty to act professionally

and avoid actions and conduct geared to harass an opponent or gain an unfair advantage. See *id.*

at 110 F.3d 293–94.

Saxe's behavior at the Scifo and Kaladish depositions is eerily similar to the deposition

behavior by counsel in the case of *Paramount Communications, Inc. v. QVC Network, Inc.,* 637

A.2d 34 (Del. 1994). In this case, Mr. Johnston, a Delaware attorney and counsel for the

defendant, was taking the deposition of a witness in Texas, Mr. Liedtke, who was represented by

Joseph D. Jamail. A portion of the deposition transcript is as follows:

Mr. Johnston: Are you finished?

Mr. Jamail: I may be and you may be. Now, you want to sit here and talk to me, fine.
This deposition is going to be over with. You don't know what you're doing. Obviously
someone wrote out a long outline of stuff for you to ask. You have no concept of what
you're doing. Now, I've tolerated you for three hours. If you've got another question, get
on with it. This is going to stop one hour from now, period. Go.

Mr. Johnston: Are you finished?

Mr. Thomas: Come on, Mr. Johnston, move it.

Mr. Johnston: I don't need this kind of abuse.

Mr. Thomas: Then just ask the next question.

Q.    (By Mr. Johnston) All right. To try to move forward, Mr. Liedtke,… I'll show you what's been marked as Liedtke 14 and it is a covering letter dated October 29 from Steven Cohen of Wacthell, Lipton, Rosen & Katz including QVC's Amendment Number 1 to its Schedule 14D-1, and my question—

A.    No.

Q.    —to you sir, is whether you've seen that?

A.    No. Look, I don't know what your intent in asking all these questions is, but, my God, I am not going to play boy lawyer.

Q.    Mr. Liedtke—

A.    Okay. Go ahead and ask your question.

Q.    —I'm trying to move forward with this deposition that we are entitled to take. I'm trying to streamline it.

Mr. Jamail:    Come on with your next question. Don't even talk with this witness.

Mr. Johnston:  I'm trying to move forward with it.

(Id., p. 65). Saxe's comments and commentary throughout the deposition mirrors the comments and commentary made by Mr. Jamail in the above matter.   In *Paramount Communications, Inc.,* Joe Jamail's behavior was characterized by the Delaware Supreme Court as "extraordinarily rude, uncivil, and vulgar… [the] kind of misconduct [that will] not be tolerated in any Delaware court proceeding, including depositions taken other states in which witnesses appear represented by their own counsel."  The court sanctioned Mr. Jamail and allowed him thirty days in which to voluntarily appear and show cause why he should not be barred from any future appearance in a Delaware proceeding.

In *Principe v. Assay Partners*, 586 N.Y.S.2d (Sup. Ct. 1992), Beth Rex, an associate in a law firm, was representing a defendant during a deposition when attorney Lawrence Clark made the following remarks to Ms. Rex in front of numerous attorneys, the witness, and the reporter: "I don't have to talk to you, little lady"; "Tell that little mouse over there to pipe down"; "What do you know, young girl"; "Be quiet, little girl"; and Go away, little girl." Furthermore, according to Ms. Rex, Mr. Clarke's comments "were accompanied by disparaging gestures… dismissively flicking his fingers and waving a back hand at me."

Saxe made similar insulting comments and gestures with regard to his deposition conduct.  In *Principe*, Lawrence Clark's behavior was condemned by the Supreme Court of New York as unprofessional and warranting sanctions. The court ordered Mr. Clark to personally pay $500 to the Clients' Security Fund and $500 to the movant's attorney as a reasonable attorney's fee.  Defendants ask for similar sanctions for Saxe's behavior.

In *Castillo v. St. Paul Fire & Marine Insurance Co.*, 938 F.2d 776  (7th Cir. 1991), the following exchange occurred when defense counsel attempted to call the judge because plaintiff and his counsel, notwithstanding a court order procured on motion, refused for the second time to answer questions that were initially asked at plaintiff's first deposition:

> Mr. Walker: (plaintiff's counsel): I would caution you not to use any telephone in this office unless you are invited to do so, counsel.
>
> Mr. Stanko: (defense counsel): You're telling me I can't use your telephones?
>
> Mr. Walker: You can write your threatening letters to me. But, you step outside this room and touch the telephone, and I'll take care of you in the way one does who has possessory rights.

In *Castillo*, the federal district court dismissed plaintiff's complaint with prejudice and found plaintiff's counsel in civil contempt, which could be purged by paying the expenses and

fees of the defense. The court also referred plaintiff's counsel to a three-judge panel to determine the appropriate discipline. Finding that it had "the inherent power and responsibility to supervise the conduct of attorneys who are admitted to practice before it," the court suspended Mr. Walker from the practice of law for one year.

Saxe's behavior at both the *Scifo* and *Kaladish* depositions is the same type of bullying and otherwise egregious behavior shown and sanctioned in the foregoing cases. The Defendants note that in the matter at bar, none of Saxe's comments slipped out in the heat of battle, nor were they isolated. They were both intentional and strategic - intending to slow access to information by insulting Kemp and attempting to throw her off her game plan. Saxe made at numerous demeaning comments designed to anger and humiliate Kemp during the course of the Kaladish deposition, for example; he informed his client that "[s]he gets confused. That's why she doesn't withdraw the question and poses another question," ; that she was "absolutely unbearable to deal with"; and that he would take her "to grievance." (Exh. C, pp. 41, 46 and 66).

Reading the two transcripts, it is apparent that Saxe attempts to seize the moment to control Kemp's opportunity to conduct the deposition by bombarding her with unfounded objections and threats to "cut-off" the deposition. Additionally, Saxe coached the witness through his speaking objections and even criticized opposing counsel insinuating that she was in over her head and ill prepared for the deposition. The transcript clearly shows that Saxe: (a) improperly directed the witness not to answer certain questions; (b) was extraordinarily rude and uncivil; and (c) obstructed the ability of Kemp to elicit testimony. Saxe continually interrupted the questioning, engaged in colloquies and objections which sometimes suggested

answers to questions, and constantly pressed Kemp for time throughout the deposition As such,

his conduct cries out for relief under federal rules of civil procedure.

## V.    CONCLUSION

Justice Sandra Day O'Connor highlighted the national concern about the deterioration in

civility in a speech delivered on December 14, 1993, to an American Bar Association group on

"Civil Justice Improvements."

> I believe that the justice system cannot function effectively when the
> professionals charged with administering it cannot even be polite to one
> another. Stress and frustration drive down productivity and make the
> process more time-consuming and expensive. Many of the best people get
> driven away from the field. The profession and the system itself lose
> esteem in the public's eyes.

The Honorable Sandra Day O'Connor, "Civil Justice System Improvements," ABA at 5

(Dec. 14, 1993) (footnotes omitted).

Saxe's behavior at the Scifo and Kaladish depositions was outrageous and unacceptable.

If he had engaged in this type of conduct before the court on the record, he would have been

subject to censure or more serious sanctions.  In defendants' opinion, however, this type of

conduct at a deposition is even more despicable. As one court held:

> Depositions are the factual battleground where the vast majority of litigation
> actually takes place. . . . Thus, it is particularly important that this discovery
> device not be abused. Counsel should never forget that even though the
> deposition may be taking place far from a real courtroom, with no black-
> robed overseer peering down upon them, as long as the deposition is
> conducted under the caption of this court and proceeding under the authority
> of the rules of this court, counsel are operating as officers of this court. They
> should comport themselves accordingly; should they be tempted to stray, they
> should remember that this judge is but a phone call away. [3]

---

[3] Because the Scifo and Kaladish's depositions were conducted on a Saturday, unfortunately the court was not "but a
phone call away."  Additionally, Kemp was all alone in the Stamford office; no other Robinson & Cole employee
was present and Kemp began feeling concerned for her physical safety. Ex. A, ¶ 28.

*Hall v. Clifton Precision,* E.D. Pa., 150 F.R.D. 525, 531 (1993) (ruling on "coaching," conferences between deposed witnesses and their lawyers, and obstructive tactics).

Although defendants acknowledge that the questioning in the Kaladish deposition could have proceeded more crisply, this was not a case where it was the questioner who abused the process. Saxe's wanted to "rattle" the questioner to the extent that she lost focus and to that extent he succeeded. Saxe's conduct prevented the proper conduction of not one but two depositions and the court cannot countenance such behavior.

Accordingly, defendants UnumProvident Corporations and Provident Life & Casualty Insurance Company (hereinafter and collectively known as "Provident") hereby move this Court to impose appropriate sanctions upon plaintiff Lawrence A. Kaladish and his attorney, Tracy Alan Saxe including but not limited to:

- An order directing that these two depositions be retaken at plaintiff's expense;

- An order directing plaintiff reimburse defendants for the full cost of the attempted depositions of Scifo and Kaladish on September 11, 2004, costs which include court reporter and attorney's fees;

- An order directing Saxe to limit objections, coaching and instructions not to answer in accordance with the Rules of Federal Procedure for all future depositions taken in this case;

- An order directing that any depositions that must be taken in the evening or on a weekend be taken under the auspices of a discovery master with plaintiff to bear all costs associated with such a deposition;

- An order directing plaintiff's attorney to pay an appropriate sanction into court;

- An order directing plaintiff to pay the cost of this motion;

- An order directing the plaintiff's attorney to appear before this court and show cause why he should be allowed to continue to practice before it.

Respectfully Submitted,

DEFENDANTS
UNUMPROVIDENT CORPORATION
AND PROVIDENT LIFE & CASUALTY
INSURANCE COMPANY


By_ *Helen M. Kemp*
    Helen M. Kemp (ct 14790)
    Theodore J. Tucci (ct 05249)
    Robinson & Cole LLP
    280 Trumbull Street
    Hartford, CT 06103-3597
    Tel. No.: (860) 275-8200
    Fax No.: (860) 275-8299
    E-mail: hkemp@rc.com

**CERTIFICATION**

This is to certify that a copy of the foregoing was sent via first class mail, postage

prepaid, on this 17th day of September 2004, to

Tracy Alan Saxe, Esq.
Saxe, Doernberger & Vita, P.C.
1952 Whitney Avenue
Hamden, CT  06517


*Helen M. Kemp*
Helen M. Kemp